FILED & ENTERED

OCT 03 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY tatum        DEPUTY CLERK

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re: | Case No. 2:12-bk-11628-RK |
| LEODIS CLYDE MATTHEWS, | Chapter 7 |
| Debtor. | Adv. No. 2:12-ap-01499-RK |
| WESTLAND ARCHITECTURE & DEVELOPMENT CORPORATION, | **MEMORANDUM DECISION AND ORDER AFTER TRIAL ON PLAINTIFF'S ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(2)(A) AND OBJECTING TO ENTRY OF DISCHARGE PURSUANT TO 11 U.S.C. §§ 727(a)(2), (a)(3) AND (a)(5)** |
| Plaintiff, | |
| v. | |
| LEODIS CLYDE MATTHEWS, | |
| Defendant. | |

The above-captioned adversary proceeding on the complaint of Plaintiff Westland Architecture & Development Corporation ("Westland" or "Plaintiff") came on for trial before the undersigned United States Bankruptcy Judge on January 22 and 23, 2015. Anthony N. Ranieri of the Law Offices of Anthony N. Ranieri and Duane R. Folke of the Law Offices of Duane R. Folke appeared on behalf of Plaintiff.  Allan B. Cooper and Howard I. Camhi of Ervin Cohen & Jessup LLP appeared on behalf of Defendant Leodis Clyde Matthews ("Matthews," "Debtor," or "Defendant").

On March 28, 2012, Westland filed its adversary complaint ("Complaint") against Matthews.  ECF 1.  In its Complaint, Westland's first claim for relief seeks to have the judgment entered on March 5, 2008 by the Superior Court of the State of California, County of Los Angeles ("Los Angeles Superior Court") in the case entitled *Valentine, et al vs. Matthews, et al,* Case No. BC214701, for breach of fiduciary duty and legal malpractice in favor of Westland and against Matthews in the amount of $2,016,709.00 ("State Court Judgment") deemed nondischargeable under 11 U.S.C. § 523(a)(2)(A). *Complaint*, ECF 1 and 2, ¶¶ 10-12 and Exhibit 1 thereto.  Westland's third, fourth, and sixth claims for relief seek denial of Matthews's Chapter 7 discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3) and (a)(5), respectively.  *Id.*, ¶¶ 17-24.  Westland withdrew its second claim for relief under 11 U.S.C. § 523(a)(4), *Amended Joint Pretrial Stipulation*, ECF 32, at 37, and its fifth claim for relief under 11 U.S.C. § 727(a)(4), *Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 16.

On April 10, 2015, the court entered its order approving Westland and Matthews's stipulation to extend the deadlines to submit their proposed findings of fact and conclusions of law to the court and their responses thereto.  ECF 164.  On May 1, 2015, Westland timely submitted its proposed findings of fact and conclusions of law to the court.  ECF 166 and 167.  On June 18, 2015, Matthews timely submitted his proposed findings of fact and conclusions of law, ECF 168, and filed his objection to Westland's proposed findings of fact and conclusions of law, ECF 169.  On July 1, 2015, Westland timely filed its response to Matthews's objection, ECF 170, and filed two separate objections to Matthews's proposed findings of facts and conclusions of law, ECF 171 and 172.

Having considered the testimony of the witnesses, the evidence received at trial, the oral and written arguments of the Parties, the proposed findings of fact and conclusions of law submitted by the Parties and the responses thereto, and the record before the court, the court hereby makes the following findings of fact and conclusions of

law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52 of

the Federal Rules of Civil Procedure.[1]

### **FINDINGS OF FACT**

1.       On March 28, 2012, Westland timely filed its Complaint against Matthews

for nondischargeability of debt under 11 U.S.C. §§ 523(a)(2) and (a)(4) and denial of

Matthews's Chapter 7 discharge under 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4) and (5).

ECF 1.  Westland withdrew its 11 U.S.C. §§ 523(a)(4) and 727(a)(4) claims for relief.

*Amended Joint Pretrial Stipulation*, ECF 32 at 37; *Plaintiff's [Proposed] Findings of Fact*

*and Conclusions of Law*, ECF 166 and 167, at 16.

2.       At the time that Westland filed its Complaint on March 28, 2012, it was a

suspended California corporation, having been suspended on August 1, 2011 to "file" its

taxes (i.e., failure to pay its corporate franchise taxes).  *Defendant's Exhibit BB*,

*Certificate of Status*; *Trial Testimony of Youless Jimmy Valentine* ("*Valentine Trial*

*Testimony*"), January 22, 2015 at 10:55-10:56 a.m.  Westland was not revived as a

corporation until December 6, 2013, *Defendant's Exhibit BB*, *Certificate of Status*, after

the deadline to file a complaint for nondischargeability of debt under 11 U.S.C. § 523(c)

and objection to discharge under 11 U.S.C. § 727 expired.  *See* Rules 4004(a) and

4007(c) of the Federal Rules of Bankruptcy Procedure (60 days after the first date for the

meeting of creditors set for February 27, 2012, ECF 4, the deadline to file a complaint for

nondischargeability of debt under 11 U.S.C. § 523(c) and objection to discharge, expired

on April 27, 2012).

3.       On April 30, 2012, Matthews served and filed his answer ("Answer") to

Westland's Complaint.  ECF 6.  On September 13, 2013, the parties filed their Amended

Joint Pretrial Stipulation, ECF 32, and on October 3, 2013, the court entered its order

---

[1] Any findings of fact that should be properly characterized as conclusions of law will be considered as such and any conclusions of law that should be properly characterized as findings of fact will be considered as such.

adopting the Amended Joint Pretrial Stipulation, ECF 34.  Matthews did not raise

Westland's lack of capacity due to its corporate suspension when Westland filed its

Complaint as a defense in either Matthews's Answer or the Amended Joint Pre-Trial

Stipulation.  *See* ECF 32 and 34.

4.     On December 2, 2013, Matthews filed a motion to dismiss

Westland's complaint.  ECF 78.  On May 17, 2014, the court entered its Order Denying

Defendant's Motion to Dismiss Complaint on the basis that "the statute of limitations

defense based on lack of capacity was forfeited when not raised in the answer to the

complaint."  ECF 102.

5.     On May 15, 2014, Matthews filed a motion to amend and/or

supplement pleadings, including, among other things, his answer and the Parties'

Amended Joint Pre-Trial Stipulation and Order thereon.  ECF 104.  On August 5, 2014,

the court entered its Order Denying Motion to Amend Pre-Trial Stipulation and Pleadings,

denying Matthews motion to amend and/or supplement pleadings, "except that the

parties are granted leave to present evidence and argument at trial on the issues of

defendant's waiver of his [Rule] 4004 and 4007 defenses, whether [Rule] 4004 and 4007

defenses constitute substantive statutes of limitations, and whether the revivor of

Westland [ ] cured any such timeliness defect."  ECF 142.


The court further makes the following findings of fact with respect to Westland's

first claim for relief in the Complaint, which seeks to have the judgment entered on March

5, 2008 by the Los Angeles Superior Court, in the case entitled *Valentine, et al. vs.*

*Matthews, et al.,* Case No. BC214701 in the amount of $2,016,709.00 deemed

nondischargeable under 11 U.S.C. § 523(a)(2)(A).

6.     Westland was incorporated in 1998 to buy and develop distressed

properties.  *Amended Joint Pre-Trial Stipulation*, ECF 32 at 2.  .

7.     Youless Jimmy Valentine ("Valentine") was Westland's President

and a member of its Board of Directors.  *Id.*; *see also, Trial Testimony of Youless Jimmy*

*Valentine* ("*Valentine Trial Testimony*"), January 22, 2015 at 9:54 a.m.

8.      Matthews is a licensed California attorney.  *Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, ¶ 1; *Defendant's [Proposed] Findings of Fact and Conclusions of Law*, ECF 168, ¶ 2.

9.      In June 1998, Westland paid $58,000 to a company named Interlink to purchase an option ("Option") to purchase a three-story office building located at 4322 Wilshire Boulevard, Los Angeles, California ("Wilshire Property") for $2.9 million from Interlink.  *Amended Joint Pre-Trial Stipulation*, ECF 32 at 2.  Westland borrowed the $58,000 from Valentine's sister.  *Valentine Trial Testimony*, January 22, 2015 at 9:56 a.m.

10.     In July 1998, Interlink attempted to rescind its agreement with Westland.  *Amended Joint Pre-Trial Stipulation*, ECF 32 at 3.  In August 1998, Westland filed a civil complaint in the Los Angeles Superior Court against Interlink for breach of contract ("Interlink Civil Action").  *Id*.  After Westland filed its civil complaint against Interlink, Interlink commenced a Chapter 7 bankruptcy case, which stayed the Interlink Civil Action.  *Id*. at 3.

11.     Attorney Benjamin Wyatt ("Wyatt"), acting on behalf of Westland, filed a creditor's claim against Interlink and commenced an adversary proceeding against Interlink in Interlink's bankruptcy case, arguing that Westland was the rightful owner of the Option.  *Id*. at 3.

12.     During the course of the Interlink bankruptcy case, the Bankruptcy Court ordered a public sale of Interlink's assets, including the Option, with the sale to take place on February 3, 1999.  *Id*. at 3.

13.     On January 25, 1999, Westland retained Matthews to advise Westland on its interest in the scheduled Option sale.  *Id*. at 3.  Wyatt was not substituted out and remained counsel of record for Westland in the adversary proceeding.  *Id*.

14.     On January 25, 1999, Matthews provided Westland with an Attorney-Client Fee Contract ("Fee Contract"), dated January 25, 1999, which Valentine signed on behalf

of Westland and Matthews signed on behalf of Matthews & Partners.  *Id.* at 3; *see also*,

*Defendant's Exhibit A*, *Attorney-Client Fee Contract.*  In the Fee Contract, Westland and

Matthews agreed that if Matthews was successful in acquiring the Option to the Wilshire

Property, then Matthews would receive an interest in the Option.  *Amended Joint Pre-*

*Trial Stipulation*, ECF 32 at 3.  The Fee Contract expressly provided, in relevant part, the

following:

    1.     SCOPE OF SERVICES.  You are hiring an Attorney [Matthews] to represent your interest in the legal matter and any in the matter, including court litigation and adversary proceedings existing in Chapter 7 proceedings involving Lydia F. Soriano, et al.  The principal purpose of Attorney's services will be to enforce the Assignment of the Option Agreement obtained from Lydia F. Soriano and Interlink Development Corporation . . .

    3.     ATTORNEY FEE TERMS and CONDITIONS:  Client [Westland] hereby retains Attorney on the following terms:  If the matter is settled, Attorney will be entitled to an interest in Client Corporation and its interest in 4322 Wilshire Blvd., Los Angeles [Wilshire Property].  This contingent interest will attach only if Client obtains the Option for the Sale of 4322 Wilshire Blvd., Los Angeles as a result of efforts of Attorney.  If there are other related legal matters handled by attorney, they will be the subject of a separate agreement, but will be billed at the attorney's normal hourly rate for litigation[.]  Client and Attorney hereby agree to execute all relevant documents required to fully effectuate the terms of this agreement.

*Defendant's Exhibit A, Attorney-Client Fee Contract,* at 1.

    15.     Sometime after January 25, 1999 and before February 2, 1999, Matthews

learned that the Chapter 7 Trustee for Interlink's Chapter 7 bankruptcy case intended to

sell all of Interlink's assets, including the Option, on February 3, 1999.  *Amended Joint*

*Pre-Trial Stipulation*, ECF 32 at 3.  Matthews notified Valentine of the Chapter 7 Trustee's

sale.  *Id.*  Valentine and Matthews agreed to meet in the Bankruptcy Court on February 3,

1999 for the Trustee's sale.  *Id.*

    16.     In a letter dated February 2, 1999, Matthews advised Valentine, individually

and on behalf of Westland, of the actual and potential conflicts of interest between

Matthews and Westland if Westland was successful in acquiring the Option ("Conflict of

Interest Letter").  *Id.* at 3-4; *see also*, *Defendant's Exhibit B*, *Conflict of Interest Letter*.

The Conflict of Interest Letter expressly provided, among other things, that:

With respect to the purchase of claims, it may be that I will eventually receive some monetary, financial or other benefit in connection with my participation in these transactions, from one or more sources.

The foregoing language is to be broadly construed to cover any potential or actual conflict of interest that may have arisen or may arise from any act to engage in any business related transactions . . .  The bar rules also require that I recommend you consult with another attorney in deciding whether or not consent should be given.   Another attorney could also identify and advise you further on other potential conflicts in our interests.

*Id.*  Valentine signed the Conflict of Interest Letter acknowledging the potential and actual conflicts of interest addressed therein on behalf of himself and Westland.  *Id.*

17.    Westland was the successful bidder of the Option at the Trustee's sale for the sum of $212,500.00.  *Valentine Trial Testimony*, January 22, 2015 at 10:00 a.m. and 10:09 a.m.  However, Westland did not have the money with which to make its bid.  *Id.* at 10:00 a.m.  Instead, the money was provided by "sources" found by Matthews. *Id.* If Westland did not have the money through sources found by Matthews, Westland would not have been able to acquire the Option.  *Id.*

18.    After it purchased the Option, Westland voted to replace Valentine as the President of Westland.  *Id.* at 10:01 a.m.; *see also*, *Amended Joint Pre-Trial Stipulation*, ECF 32 at 4.  Valentine could not recall if he was also removed as a member of Westland's Board of Directors at that time.  *Valentine Trial Testimony*, January 22, 2015 at 10:06 a.m.  Westland's Board of Directors installed a new president, Fabio Lapido ("Lapido"), and on March 16, 1999, Westland retained a new attorney, Lorraine Loder ("Loder"), to represent Westland.  *Amended Joint Pre-Trial Stipulation*, ECF 32 at 4.

19.    At some point, Westland had applied for a loan to fund the purchase of the Wilshire Property.  *Id.*  Although a proposed lender issued a conditional commitment letter, the conditions of that commitment letter were never satisfied.  *Id.* Under its new leadership, Westland decided that it did not want to or could not exercise the Option to purchase the Wilshire Property.  *Id.* at 4; *see also*, *Valentine Trial Testimony*, January 22, 2015 at 10:04-10:05 a.m.

20.    After Westland decided that it did not want to purchase the Wilshire

Property, Westland decided to offer to sell the Option to Valentine.  *Id.* at 10:04-10:06

a.m. and 10:48-10:49 a.m.  At the time Westland made the decision to offer to sell the

Option to Valentine, Valentine was again a member of Westland's Board of Directors.  *Id.*

Loder, at the direction of the Westland's Board of Directors, sent a letter dated March 25,

1999 ("March 25, 1999 Letter") to Valentine offering to sell Valentine the Option at a

"reasonable price."  *Id.* at 10:05 a.m.; *see also*, *Defendant's Exhibit D*, *May 25, 1999

Letter*; *Amended Joint Pre-Trial Stipulation*, ECF 32 at 4.

  21. Loder also sent a letter to Matthews dated April 21, 1999 ("April 21, 1999

Letter") explaining Westland's willingness to sell the Option to "Valentine and/or his

designees" for a price which would allow Westland to "clear up its current obligations"

totaling approximately $389,936.67, including:  $212,500.00 from Matthews's investors to

pay for the Option; $92,752.67 loan from Valentine's sister; $19,000.00 claim for services

to Valentine's nephew; $36,000.00 claim for architectural services to Ladipo; $8,634.00

claim for construction services to Ceasar Bijou; $1,000.00 claim for services to Marvin

Jackson; $10,000.00 in legal fees to Loder; $1,750.00 claim for interest on loan to Betty

Nash; $5,800.00 for shareholder contributions; and $2,500 in miscellaneous costs.

*Defendant's Exhibit"E*, *April 21, 1999 Letter*; *see also*, *Valentine Trial Testimony*, January

22, 2015 at 10:08-10:10 a.m.

  22. Valentine did not obtain financing to purchase the Option and did not accept

Westland's offer to purchase the Option.  *Valentine Trial Testimony*, January 22, 2015 at

10:06-10:08 a.m.; *Amended Joint Pre-Trial Stipulation*, ECF 32 at 4.  When Valentine did

not obtain financing, Matthews concluded that Valentine would be unable to purchase the

Option from Westland and buy the Wilshire Property.  *Id.*  Matthews decided to attempt to

acquire the Option for a group of investors, including himself, but not including Valentine.

*Id.*

  23. Matthews formed Retra Financial, Inc. ("Retra") and informed Westland that

Retra was interested in acquiring and exercising the Option.  *Id.* at 4-5.  Based on the

evidence submitted by the parties and the testimony of Valentine and Matthews, the

actual date Matthews formed Retra is unclear.  However, based on the testimony of

Valentine and Matthews, and the Resolution of Westland's Board of Directors dated May

15, 1999 ("Resolution") to sell the Option to Retra, the court infers that Matthews formed,

but did not incorporate, Retra before the May 15, 1999 Westland Board of Directors

meeting.  *Valentine Trial Testimony*, January 22, 2015 at 10:16-10:18 a.m. (testifying that

there were at least five Board of Directors meetings that he attended at which they

discussed selling the Option to Retra); *Trial Testimony of Leodis Clyde Matthews*

("*Matthews Trial Testimony*"), January 22, 2015 at 11:51 a.m. (testifying that he informed

Westland and Loder of his interest in Retra before the May 15, 1999 meeting of the

Board of Directors); *see* also, *Defendant's Exhibit F*, Westland's Resolution (Westland's

Resolution to sell the Option to Retra).  Matthews incorporated Retra after Retra

purchased the Option from Westland.  *Matthews Trial Testimony*, January 22, 2015 at

11:50-11:51 a.m.

24.    Westland's Resolution to sell the Option to Retra expressly provided,

in relevant part, the following:

> After having discussed the relevant issues, the Board [of Directors of Westland] passed the following resolution:

> RESOLVED that, in consideration of the promises of Retra [ ] ("RF") and [ ] Matthews [(]"LCM") as set forth below, Westland hereby ratifies and affirms that any and all interest it may have acquired by reason of the Bankruptcy sale of assets of Interlink Development Corporation ("IDC"), and any related entities, as well as any interest it may have previously held in the Master Lease or Option to Purchase and in the building at 4233 Wilshire Boulevard, Los Angeles, CA [Wilshire Property], are hereby transferred in their entirety to [RF]. . . .

> RESOLVED FURTHER that the foregoing resolutions were adopted in consideration of the promises of RF and LCM as follows:

>> 1.    [RF], by and through its representative, [LCM] will hold Westland and its Board of Directors free and harmless from any and all liability for claims against Westland which have been identified in the April 21, 1999 letter [April 21, 1999 Letter] from Lorraine L. Loder to LCM.  The indemnification of RF and LCM shall not apply to any claims which Westland may have against any individual board member.

>> 2.    With respect to all such claims, Westland shall appoint RF and/or LCM to resolve all such claims.  Westland and its

1    board will not incur any liability for such representations or any
2    resulting judgments. . . .

3    4.    RF or LCM shall pay any of the designated Westland claims
4    when they have been finally resolved by negotiation, mediation
     or adjudication in a court or arbitration proceeding.

5    5.    LCM personally guaranties [sic] the performance of RF above
6    described.

7    *Defendant's Exhibit F*, *Westland's Resolution*.  The Resolution was signed by Westland's

8    Board of Directors, including Valentine.  *Id.; Valentine Trial Testimony*, January 22, 2015

9    at 10:14-10:16 a.m.  As noted in paragraph 21 above, the April 21, 1999 Letter from

10   Loder to Matthews referenced in the Resolution specifically identified Westland's debts

11   as totaling approximately $389,936.67.  *Defendant's Exhibit E*, April 21, 1999 Letter.  By

12   the Resolution, Westland intended to transfer its interest in the Option to Retra in

13   consideration for Retra's promise to pay Westland's designated debts identified in the

14   April 21, 1999 Letter from Loder to Matthews.  *Id.; Defendant's Exhibit F*, *Westland's

15   Resolution*; *see also, Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ¶ 15

16   ("On May 15, 1999, Westland resolved to sell the Option to Retra in exchange for a

17   payment of $389,936.67, which included repayment of Retra loan of $212,000.00.");

18   *Defendant's [Proposed] Findings of Fact and Conclusions of Law*, ¶ 19 ("On May 15,

19   1999, Westland's Board of Directors adopted and executed a resolution to transfer all of

20   its interests it may have had in and to the Option and the Wilshire Property in

21   consideration of the promises made by Retra and Defendant individually, including (1)

22   Retra's and Defendant's holding Westland and its Board of Directors free and harmless

23   from the liabilities identified in attorney Loder's April 21, 1999 letter . . . .").

24        25.    At the time Westland agreed to sell the Option to Retra, Westland was

25   represented by Loder.  *Valentine Trial Testimony*, January 22, 2015 at 11:20 a.m.;

26   *Defendant's Exhibit E*, April 21, 1999 Letter.  As evidenced by Westland's Resolution to

27   sell the Option to Retra, Westland knew that Retra was being represented by Matthews in

28   the sales transaction.  *See Defendant's Exhibit F*, *Westland's Resolution* (expressly

1  stating that Matthews was representing Retra in the sales transaction and was

2  guaranteeing Retra's obligations under the sales transaction).  Although Valentine

3  testified that he did not "understand" that Matthews was representing Retra in the sales

4  transaction, despite the fact that he knew of and signed the Resolution, he testified that

5  he knew Matthews was representing another party's interest in the sales transaction

6  other than Westland's.  *Valentine Trial Testimony*, January 22, 2015 at 11:21-11:23 a.m.

7      26.    It is undisputed that Matthews had an interest in Retra, *Matthews Trial*

8  *Testimony*, January 22, 2015 at 11:48-11:51 a.m.; *Valentine Trial Testimony*, January 22,

9  2015 at 11:23 a.m., and that Valentine did not have an interest in Retra, *Amended Joint*

10  *Pre-Trial Stipulation*, ECF 32 at 5; *Valentine Trial Testimony*, January 22, 2015 at 11:16-

11  11:20 a.m.  What is disputed, however, is whether Matthews disclosed his interest in

12  Retra prior to the execution of Westland's Resolution on May 15, 1999. Matthews

13  testified that he "spoke" with Loder regarding his interest in Retra prior to the May 15,

14  1999 meeting of Westland's Board of Directors and "informed" the Board of Directors of

15  his interest.  *Matthews Trial Testimony*, January 22, 2015 at 11:51 a.m.  Valentine

16  testified that Matthews did not disclose his interest in Retra prior to the May 15, 1999

17  meeting.  *Valentine Trial Testimony*, January 22, 2015, at 11:23 a.m. and 11:34 a.m.

18  However, Valentine did testify that he always believed Matthews was the purchaser of

19  the Option.  *Id.*, at 11:26 a.m.  The court determines that, whether or not Matthews

20  disclosed his interest in Retra at the time of or before the May 15, 1999 meeting of the

21  Board of Directors, Westland knew that Matthews was representing Retra's interests in

22  the sale transaction as evidenced by the Resolution, which expressly provided that

23  Matthews was representing Retra in the sales transaction and that Matthews was

24  guaranteeing Retra's performance under the sales contract.  *See Defendant's Exhibit F*,

25  Westland's Resolution.

26      27.    Valentine testified that he and the other Board members signed

27  the Resolution because Matthews threatened to sue them all unless Westland transferred

28  the Option to Retra.  *Valentine Trial Testimony*, January 22, 2015 at 11:28-11:29 a.m.

and 11:33-11:35 a.m.  In its closing argument, Westland argued that its Exhibits 14-A and 14-B, including two letters dated February 5, 1999 and February 19, 1999, respectively, which allegedly designated Retra as the nominee of Westland under the bankruptcy court's order transferring the Option from Interlink to Westland, evidenced such threats. *Trial Transcript*, January 23, 2015 at 2:20 p.m.; *see also*, *Plaintiff's Exhibit 14-A*, February 5, 1999 Letter and *Exhibit 14-B*, February 19, 1999 Letter.  Only the February 19, 1999 letter made any reference to litigation stating, "We [Matthews and Retra] are prepared to continue litigation in bankruptcy court unless Westland recognizes our claims to the above building." *Id*.  The letters were allegedly written by Matthews to Valentine.  *See id*. Matthews contends that he did not write or sign the letters nor authorize a third party to sign them on his behalf.  *Matthews Trial Testimony*, January 22, 2015 at 11:41-11:44 a.m. and 1:42 p.m.  Notwithstanding the letters' authenticity, the court determines that Valentine's testimony and the February 5, 1999 and February 19, 1999 letters do not show an actual threat of litigation coercing the Board members, including Valentine, to sign the Resolution, because no evidence was submitted to the court that Retra and/or Matthews had commenced or was even in the process of commencing litigation against Westland to enforce its rights, if any, in the Option prior to the execution of the Resolution at the May 15, 1999 Board of Directors meeting.

28.    On May 24, 1999, Valentine, as an "Authorized Board Member" of Westland, executed an "Assignment of Option to Purchase and Designation of Nominee" ("Assignment") on behalf of Westland, conveying "any interest it [Westland] may have acquired or held in an Option to Purchase existing on 4322 Wilshire Blvd., Los Angeles, Ca. [Wilshire Property], to Retra . . . ." *Defendant's Exhibit G*, *Assignment of Option to Purchase and Designation of Nominee*.  On May 24, 1999, Westland sold the Option to Retra. *Amended Joint Pretrial Stipulation*, ECF 32 at 5.  Matthews and Retra exercised the Option within five weeks of Retra acquiring the Option.  *Matthews Trial Testimony*, January 22, 2015 at 1:30-1:31 p.m.

29.    When asked whether Matthews obtained a written conflict of interest

waiver regarding the sale of the Option from Westland to Retra, Matthews testified that he only obtained the signed Conflict of Interest Letter dated February 2, 1999. *Matthews Trial Testimony,* January 22, 2015 at 11:52 a.m.; *see also*, *Defendant's Exhibit B, Conflict of Interest Letter.* However, the court finds that the Conflict of Interest Letter dated February 2, 1999 did not disclose Matthews's interest in Retra, nor did it disclose that Matthews intended to purchase an interest in the Option through Retra, that Matthews was representing Retra in the sale transaction of the Option, nor that Matthews was guaranteeing Retra's obligations under the sale transaction of the Option. *See id.*

30.    Sometime after May 15, 1999 and before August 5, 1999, Valentine was re-elected president of Westland. *Amended Joint Pre-Trial Stipulation*, ECF 32 at 5. On August 5, 1999, Valentine, individually and on behalf of Westland, filed a civil action in the Los Angeles County Superior Court, Case No. BC214701 ("State Court Action") against Matthews, among others, for breach of fee contract, legal malpractice and breach of fiduciary duty. *Id.*; *see also*, *Defendant's Exhibit I, Second Amended Complaint.*

31.    Retra filed a cross-complaint in the State Court Action against Valentine for slander of title. *Amended Joint Pre-Trial Stipulation*, ECF 32 at 5. Matthews and Retra filed another cross-complaint against Westland and Valentine for breach of contract, intentional interference with business relations, negligent interference with business relations, unfair business practices, fraud in the inducement, slander of title and cancellation of cloud on title. *Id.*; *Defendant's Exhibit L, Cross-Complaint.*

32.    On January 18, 2000, Valentine, Westland and Interlink filed a Second Amended Verified Complaint for Damages ("Second Amended Complaint") in the State Court Action against Matthews, among others, for breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, negligence, fraudulent conversion, constructive trust, conspiracy, legal malpractice, accounting, unfair business practices, and temporary, preliminary and permanent injunction. *Defendant's Exhibit I, Second Amended Complaint.*

33.    On May 10, 2004, the Second Amended Complaint in the State Court

Action was tried to a jury. *Defendant's Exhibit O*, *State Court Judgment* at 2. Based on the Second Amended Complaint, Westland prosecuted claims of breach of legal service agreement, breach of fiduciary duty and professional negligence, and Valentine separately prosecuted claims of breach of legal service agreement, breach of fiduciary duty, professional negligence and conversion. *Id.* All other claims of the Second Amended Complaint were voluntarily dismissed prior to the commencement of the jury trial. *Id.* Additionally, Interlink was voluntarily dismissed as a plaintiff in the State Court Action before the commencement of the jury trial. *Id.*

34.    On May 21, 2004, the jury returned a special verdict in the State Court Action. *Id.* The jury found that Matthews represented Westland from "January 25, 1999 to May 15, 1999," and did not breach his legal service agreement with Westland, *id.* at 2-3; Matthews owed Westland a fiduciary duty and Matthews breached that fiduciary duty, damaging Westland in the amount of $2,016,709.00, *id.* at 3-5; and Matthews's representation of Westland fell below the standard duty of care and, therefore, Matthews committed legal malpractice against Westland, damaging Westland in the amount of $2,016,709.00, *id.* at 5-6. Valentine's claims against Matthews alleged in the Second Amended Complaint were dismissed. *Amended Joint Pre-Trial Stipulation*, ECF 32 at 6.

35.    On June 23, 2004, the cross-complaint of Matthews and Retra against Westland and Valentine was tried in the Los Angeles County Superior Court. *Defendant's Exhibit O*, *State Court Judgment* at 12. Retra prosecuted claims of slander of title and cancellation of cloud of title against Westland and Valentine. *Id.* All other claims of the cross-complaint were voluntarily dismissed before the bench trial. *Id.* Additionally, Matthews was voluntarily dismissed as a cross-complainant before the bench trial. *Id.* The court found in favor of Retra on the claims submitted and against Westland and Valentine, jointly and severally, in the amount of $61,084.75 in compensatory damages and $20,000.00 in punitive damages. *Id.*

36.    On November 1, 2004, the Los Angeles Superior Court adopted its October 20, 2004 draft ruling granting Retra's motion for judgment notwithstanding the verdict and

motion for a new trial, and denying Valentine's motion for a new trail.  *Defendant's Exhibit M*, *Order on Motions for Judgment Notwithstanding the Verdict and a New Trial*; *see also*, *Defendant's Exhibit O*, *State Court Judgment,* at 12.  Thereafter, on October 11, 2005, the Los Angeles Superior Court entered a judgment reflecting the judgment notwithstanding the verdict.  *Id.*

37.    Westland and Matthews appealed the judgment of the Los Angeles Superior Court to the Court of Appeal  of the State of California for the Second District. *Amended Joint Pre-Trial Stipulation*, ECF 32 at 6.  On October 1, 2007, the Court of Appeal filed its Opinion ruling on the procedural ground that the trial court, the Los Angeles Superior Court, did not have jurisdiction to grant the JNOV (judgment notwithstanding the verdict) motion and the motion for new trial because, pursuant to California Code of Civil Procedure §§ 629 and 660, it did not timely file its final orders.  *Id.* The Court of Appeal directed the Los Angeles Superior Court to reinstate the jury verdict in favor of Westland and against Matthews.  *Id.*   Matthews sought reconsideration before the Court of Appeal arguing that the Los Angeles Superior Court should have granted his Motion to Vacate a Judgment.  *Id.*  On February 11, 2008, the Court of Appeal filed its Opinion finding the Los Angeles Superior Court did not have jurisdiction to rule on the Motion to Vacate Judgment.  *Id.* at 6-7.

38.    On March 5, 2008, the Los Angeles Superior Court entered a final judgment, including the State Court Judgment, on the Second Amended Complaint and Cross-Complaint.  *See Defendant's Exhibit O*, *State Court Judgment.*  In the State Court Judgment, the trial court noted, among other things, the Court of Appeal's ruling reversing "the order of the trial court granting judgment notwithstanding the verdict and new trial and direct[ing] the trial court to reinstate the verdict in favor of Westland and against Matthews and Matthews & Partners on the complaint"; "affirm[ing] the judgment on the cross-complaint in favor of Retra insofar as it awards compensatory damages against Westland and Valentine"; and reversing "the judgment on the cross-complaint insofar as it awarded punitive damages on the cross-complaint."  *Defendant's Exhibit O*,

*State Court Judgment,* at 12-13.  Based on the ruling of the Court of Appeal, the trial court ordered, adjudged and decreed in the State Court Judgment that judgment was entered on the Second Amended Complaint in favor of Westland and against Matthews and Matthews & Partners in the amount of $2,016,709.00, plus interest; and judgment was entered on the cross-complaint in favor of Retra and against Westland and Valentine, jointly and severally, in the amount of $61,085.75, plus interest, in compensatory damages only.  *Id.*

39.    After the jury verdict was reinstated in the State Court Action, an attorney disciplinary proceeding against Matthews was initiated before the State Bar of California. *Amended Joint Pre-Trial Stipulation*, ECF 32 at 8.  On or about May 15, 2012, Matthews entered into a "Stipulation re Facts, Conclusions of Law and Disposition" with the State Bar of California ("State Bar Stipulation").  *Id.*; *see also*, *Defendant's Exhibit Q*, *State Bar Stipulation*; *Plaintiff's Exhibit 2*, *Stipulation re Facts, Conclusions of Law and Disposition and Order Approving Actual Suspension*.  Pursuant to the State Bar Stipulation, Matthews expressly admitted and agreed that:

> By willfully making an inadequate written disclosure of the conflict of interest that arose once Westland's Board resolved to sell the option to Retra, a company in which Respondent [Matthews] held a financial interest, and by failing to obtain a supplemental written conflict of interest waiver from Westland when the transaction occurred, Respondent violated the provisions of California Rules of Professional Conduct, Rule 3-310(C).

Defendant's Exhibit Q, *State Bar Stipulation,* at 10; *Plaintiff's Exhibit 2*, *Stipulation re Facts, Conclusions of Law and Disposition and Order Approving Actual Suspension*.

40.    On June 12, 2012, the State Bar Court issued its "Stipulation Re: Facts, Conclusions of Law and Disposition and Order Approving Actual Suspension" ("State Bar Court Decision"), adopting the State Bar Stipulation and recommending, *inter alia*, Matthews's actual suspension for a period of thirty (30) days.  *Plaintiff's Exhibit 2*, *Stipulation re Facts, Conclusions of Law and Disposition and Order Approving Actual Suspension*. The State Bar Court Decision expressly provided that "[t]he parties agree to be bound by the factual stipulations contained herein even if conclusions of law

or disposition are rejected or charged by the Supreme Court"; and "[t]he stipulated facts

and disposition are APPROVED and the DISCIPLINE RECOMMENDED to the Supreme

Court. . . . The effective date of this disposition is the effective date of the Supreme Court

order herein, normally 30 days after file date (*See* rule 9.18(a), California Rule of Court.)."

*Id.* (emphasis in original).

41.    Westland did not offer any documentary evidence showing that the

California Supreme Court entered a final order on the State Bar Court Decision.


Under its third, fourth and sixth claims for relief in the Complaint, Westland seeks a

judgment denying Matthews's Chapter 7 discharge under Sections 727(a)(2), (a)(3) and

(a)(5) of the Bankruptcy Code, respectively, on the basis that Matthews (a) did not

account for all of his non-debtor spouse's income on "Schedule I-Current Income of

Individual Debtor(s)" ("Schedule I"); (b) failed to adequately account for the profit and loss

of his law practice, Leodis C. Matthews, APC, in his Schedules and Statement of

Financial Affairs as well as overstated certain operating expenses related to his law

practice; (c) failed to adequately explain the diminution in value of Leodis C. Matthews,

APC in his Schedules and Statement of Financial Affairs from September 30, 2011 to the

petition date; and/or (d) concealed $108,798.70 in cash on his "Schedule B-Personal

Property" ("Schedule B") stemming from certain mortgage payments he allegedly made.

*Trial Transcript*, January 23, 2015 at 2:29-2:44 p.m.; *see also*, *Plaintiff's [Proposed]*

*Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 16-24.  The court makes

the following findings of fact with respect to Westland's third, fourth, and sixth claims for

relief:

42.    Matthews filed his voluntary Chapter 7 bankruptcy petition ("Petition") on

January 17, 2012 ("Petition Date").  *Plaintiff's Exhibit 1,* ECF 1, *Voluntary Petition*.

43.    On Schedule I, attached to the Petition, Matthews disclosed that

he was an employee of Leodis C. Matthews, APC at the time the Petition was filed and

estimated his "average or projected [monthly] income at the time [the] case [was] filed"

1   arising from his "[m]onthly gross wages, salary, and commissions (prorated if not paid

2   monthly)" as totaling $15,000.00.  *Plaintiff's Exhibit 1*, ECF 1, *Schedule I*.

3       44.   In his "Statement of Financial Affairs," attached to the Petition, Matthews

4   disclosed that his "gross income before taxes" totaled $240,000.00 for the year of 2011,

5   which comes out to approximately $20,000.00 in gross monthly income on average for

6   the year of 2011.  *Plaintiff's Exhibit 1*, ECF 1, *Statement of Financial Affairs*; *see also*,

7   *Defendant's Trial Testimony*, January 22, 2015 at 1:50 p.m. (admitting that his gross

8   income for the year of 2011 totaled $240,000.00).

9       45.   When questioned why he listed $15,000.00 monthly income on his

10  Schedule I instead of $20,000.00, Matthews testified that, at the beginning of January

11  2012, Matthews became an "employee" of DaCheng Law Offices LLP ("DaCheng"), and

12  he knew "for sure" he was going to be making $15,000.00 per month.  *Id.*, at 2:21-2:22

13  p.m.  The Letter from Ling Xiao, Managing Partner of DaCheng, to Matthews regarding

14  Matthews's legal position with DaCheng ("DaCheng Letter") redacted the monthly income

15  Matthews was to receive from DaCheng.  Westland did not submit any evidence to

16  contradict Matthews's testimony regarding his current monthly income at the time his

17  Petition was filed.  Therefore, in the absence of evidence to the contrary, the court finds

18  that Matthews provided a satisfactory explanation of his Schedule I current monthly

19  income.

20      46.   Matthews also testified that he listed Leodis C. Matthews, APC and not

21  DaCheng, as his employer and the source of the $15,000.00 monthly income on his

22  Schedule I because his agreement with DaCheng was not reduced to a writing and

23  executed until after he filed his Petition on February 15, 2012.  *Id.*; *see also*, *Defendant's*

24  *Exhibit AA*, *Letter from Ling Xiao, Managing Partner of DaCheng, to Matthews Regarding*

25  *Matthews's Legal Position with DaCheng*.  The DaCheng Letter stated that Matthews was

26  to act as an "independent contractor" of DaCheng.  *Id.*  The court determines that

27  Matthews has provided a satisfactory explanation as to why he listed Leodis C.

28  Matthews, APC as his employer on Schedule I.  The fact that he testified he was to

become an employee of, and not an independent contractor for, DaCheng is not material.

47.    On his Schedule I, Matthews further disclosed that his non-debtor

spouse, Jacqueline Alexander ("Alexander"), was a "flight attendant-on furlough" for

United Airlines and estimated that her "average or projected [monthly] income at the time

[the] case [was] filed" arising from her "[m]onthly gross wages, salary, and commissions

(prorated if not paid monthly)" totaled $3,000.00. *Plaintiff's Exhibit 1*, ECF 1, *Schedule I*;

*see also*, *Amended Joint Pretrial Stipulation*, ECF 32 at 9 (disclosing Matthews's non-

debtor spouse's name).

48.    Matthews testified that Alexander occasionally worked at Leodis C.

Matthews, APC, in 2011. *Defendant's Trial Testimony*, January 22, 2015, at 2:43-2:44

p.m.  Specifically, Leodis C. Matthews, APC issued a number of checks in 2011 to

Alexander.  A majority of the checks were issued in the first half of the year, including:

check no. 2040 (dated 01/17/2011) in the amount of $1,000.00; check no. 2060 (dated

01/31/2011) in the amount of $2,500.00; check no. 2068 (dated 02/04/2011) in the

amount of $3,000.00; check no. 2087 (dated 02/23/2011) in the amount of $1,000.00;

check no. 2099 (dated 02/25/2011) in the amount of $2,500.00; check no. 2126 (dated

03/22/2011) in the amount of $500.00; check no. 2165 (dated 04/12/2011) in the amount

of $7,500.00; check no. 2202 (dated 05/13/2011) in the amount of $185.00; check no.

2222 (dated 05/23/2011) in the amount of $250.00; check no. 2219 (dated 05/23/2011) in

the amount of $2,500.00; check no. 2252 (dated 06/15/2011) in the amount of $548.00;

check no. 2253 (dated 06/17/2011) in the amount of $1,500.00; and check no. 2254

(dated 06/20/2011) in the amount of $2,000.00.  In the second half of the year, Leodis C.

Matthews, APC only issued three checks to Alexander totaling a nominal amount of

$1,466.00, including: check no. 2272 (dated 07/11/2011) in the amount of $506.00; check

no. 2285 (dated 08/11/2011) in the amount of $460.00; and check no. 2430 (dated

12/28/2011) in the amount of $500.00. *Plaintiff's Exhibit 3*, *Leodis C. Matthews, APC:*

*Statement of Profit and Loss for January through December 2011* at 43-45; *see also*,

*Defendant's Trial Testimony*, January 23, 2015 at 9:16 a.m. (admitting this was a ledger

that Leodis C. Matthews, APC, maintained, which was adjusted when its tax return was

filed).  Matthews's Schedule I did not reflect any monthly income generated by Alexander

from Leodis C. Matthews, APC.  *See Plaintiff's Exhibit 1*, ECF 1, *Schedule I.*

49.    On Matthews's Schedule B, attached to the Petition, Matthews

indicated under "13. Stock and interests in incorporated and unincorporated businesses,

itemize" that he owned an interest in Leodis C. Matthews, APC, which was "still

operating" and of which he attached a "Balance Sheet and Profit & Loss."  *Plaintiff's

Exhibit 1*, ECF 1, *Schedule B*.  On Schedule B, Matthews valued his interest in Leodis C.

Matthews, APC at the time the Petition was filed at $0.00.  *Id.*

50.    Matthews attached to the Petition the "Leodis C. Matthews, APC [ ]:

Statement of Profit and Loss Through September 30, 2011" for a nine month period

starting on January 1, 2011 and ending on September 30, 2011.  *Plaintiff's Exhibit 1*, ECF

1, *Leodis C. Matthews, APC: Statement of Profit and Loss Through September 30, 2011*;

*see also*, *Matthews Trial Testimony*, January 22, 2015 at 1:53 p.m. (clarifying the time

period covered by the Leodis C. Matthews, APC: Statement of Profit and Loss through

September 30, 2011).  The Leodis C. Matthews, APC: Statement of Profit and Loss

through September 30, 2011 provided, in pertinent part, that: Leodis C. Matthews, APC

generated (a) $714,071.58 in gross income; (b) $318,941.23 in total operating expenses;

(c) *$240,000.00 in "Other Expense: Owner Draw"*; and (d) $155,130.35 in net income

during the relevant period.  *Id.* (emphasis added).  Matthews clarified in his testimony that

the amounts stated in the Leodis C. Matthews, APC: Statement of Profit and Loss

through September 30, 2011 were consistent with the way Leodis C. Matthews, APC

billed for "services booked" during that time period; however, at the end of the year, the

amounts were reconciled with what actually happened.  *Matthews Trial Testimony*,

January 22, 2015 at 1:53-1:55 p.m.

51.    At some point after his petition was filed, Matthews provided a

detailed "Leodis C. Matthews, APC: Statement of Profit and Loss for January through

December 2011" on an "Accrual Basis," dated August 8, 2012, which was made available

to Westland.  *Plaintiff's Exhibit 3*, *Leodis C. Matthews, APC*:  *Statement of Profit and Loss for January through December 2011*; *see also*, *Defendant's Trial Testimony*, January 23, 2015, at 9:16 a.m. (admitting this was a ledger that Leodis C. Matthews, APC maintained, which was adjusted when its tax return was filed).  Westland alleges that Matthews provided the Leodis C. Matthews, APC: Statement of Profit and Loss from January to December 2011 to the Chapter 7 Trustee post-petition at his Rule 2004 Examination on August 9, 2012.  *Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 7 ("On August 9, 2012, [D]efendant produced a Statement of Profit & Loss for January 2011 through December 2011 for Leodis C. Matthews, APC at the request of the Chapter 7 Trustee at [D]efendant's Rule 2004 Examination.").  The Leodis C. Matthews, APC: Statement of Profit and Loss for January through December 2011 provided, among other things, that Leodis C. Matthews, APC generated (a) $498,864.39 in gross profits ($584,164.00 total income less $85,299.61 total costs of goods sold); (b) $394,733.53 in total expenses; (c) $30,851.81 in other expenses (categorized under "Ask My Accountant"); and (d) $73,279.05 in net income from January to December 2011.  *Plaintiff's Exhibit 3*, *Leodis C. Matthews, APC*:  *Statement of Profit and Loss for January through December 2011*.  An Owner's Draw was not specified in the Leodis C. Matthews, APC: Statement of Profit and Loss for January through December 2011.  *See id.*

      52.    Westland notes in its [Proposed] Findings of Fact and Conclusions of Law that Leodis C. Matthews, APC reported on its 2011 tax return $507,164.00 in total income; $437,890.00 in total deductions; and $69,274.00 in taxable income.  *Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 8; *Plaintiff's Exhibit 5*, *Leodis C. Matthews, APC's 2011 Tax Return*.  Westland argues that Leodis C. Matthews, APC did not disclose Matthews's $240,000.00 draw and the $85,299.61 in costs of goods sold in its 2011 tax return.  *Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 8; *Plaintiff's Exhibit 5*, *Leodis C. Matthews, APC's 2011 Tax Return*.  Westland further contends that the operating expenses

reflected in the Leodis C. Matthews, APC: Statement of Profit and Loss from January to December 2011, including the claimed expenses for rent, repairs and maintenance, utilities, legal fees, and "ask my accountant" are inconsistent with those reported in Leodis C. Matthews, APC's 2011 tax return. *Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 20-21; *see also*, *Plaintiff's Exhibit 5*, *Leodis C. Matthews, APC's 2011 Tax Return*.

53.    Leodis C. Matthews, APC's 2011 tax return is dated September 17, 2012. *Plaintiff's Exhibit 5*, *Leodis C. Matthews, APC's 2011 Tax Return*.  At trial, Westland did not question Matthews regarding Leodis C. Matthews, APC's 2011 tax return nor did it submit any evidence that establishes any inconsistencies or discrepancies in Leodis C. Matthews, APC's 2011 tax return.  Furthermore, Matthews testified that the Leodis C. Matthews, APC: Statement of Profit and Loss through September 30, 2011 and the Leodis C. Matthews, APC: Statement of Profit and Loss from January to December 2011 were accruals that were adjusted and reconciled when its tax return was filed. *Matthews Trial Testimony,* January 22, 2015 at 1:53-1:55 p.m.; *id.*, January 23, 2015 at 9:16 a.m.

54.    Westland further contends in its [Proposed] Findings of Fact and Conclusions of Law that Matthews failed to adequately explain the diminution in value of Leodis C. Matthews, APC from September 30, 2011 to the Petition Date.  *Plaintiff's [Proposed] Findings of Fact and Conclusion of Law*, ECF 166 and 167, at 23. Specifically, Westland contends that in the Leodis C. Matthews, APC: Statement of Profit and Loss through September 30, 2011, Leodis C. Matthews, APC, generated $155,130.35 in net income from January 1, 2011 through September 30, 2011; however, Matthews valued his interest in Leodis C. Matthews, APC, in his Schedule B in the amount of $0.  *Id.*; *see also*, *Plaintiff's Exhibit 1*, ECF 1, *Leodis C. Matthews, APC: Statement of Profit and Loss Through September 30, 2011.*

55.    Matthews testified that $155,130.35 in cash was not available from Leodis C. Matthews, APC, at the end of September 30, 2011 and that he did not know what happened to the $155,130.35 because the Leodis C. Matthews, APC: Statement of

Profit and Loss through September 30, 2011 was based on services booked from that time period, which were not reconciled until the end of the year. *Matthews Trial Testimony*, January 22, 2015 at 1:52-1:56 p.m. Matthews further testified that he could not recall if there were any accounts receivable at the end of that time period. *Id.* Matthews also testified that after September 30, 2011, business dropped off because of the pending California State Bar charges. *Matthews Trial Testimony*, January 23, 2015 at 9:44-9:45 a.m. Westland did not submit any evidence demonstrating that the $155,130.35 was actually available at the end of September 30, 2011, that Matthews mishandled the $155,130.35, or that any accounts receivable were remaining from Leodis C. Matthews, APC, at the end of September 30, 2011.

56.    In his "Schedule D: Creditors Holding Secured Claims" ("Schedule D"), attached to the Petition, Matthews scheduled a secured claim in the amount of $108,798.70 ("Chase Claim") in favor of JP Morgan Chase Bank ("Chase") related to his "residence" located at 400 South Rossmore Boulevard, Los Angeles, CA ("Rossmore Property"). *Plaintiff's Exhibit 1*, ECF 1, *Schedules A and D*. The Chase Claim was characterized as "disputed impound balance residence" in his Schedule D. *Plaintiff's Exhibit 1*, *Schedule D*. The $108,798.70 was not listed as an asset in Matthews's Schedule B. *Plaintiff's Exhibit 1*, *Schedule B.*

57.    Matthews testified that Chase foreclosed on its trust deed on the Property in 2009. *Matthews Trial Testimony*, January 22, 2015 at 2:07-2:10 p.m. On November 18, 2011, Chase executed a Notice of Rescission, recorded on November 28, 2011, rescinding, cancelling and withdrawing its Declaration of Default and Demand for Sale and Notice of Breach and Election to Cause Sale. *Defendant's Exhibit S*, *Notice of Rescission.* The Notice of Breach and Election to Cause Sale appears to have been recorded on March 24, 2009. *See id.* On November 22, 2011, Chase recorded its Notice of Rescission of Trustee's Deed Upon Sale, voiding the Trustee's Deed Upon Sale purportedly selling the Rossdale Property to Chase on June 29, 2010. *Defendant's Exhibit R*, *Notice of Rescission of Trustee's Deed Upon Sale*. On November 9, 2011,

Matthews executed a Loan Modification Agreement with Chase, dated October 20, 2011, that was to become effective on December 1, 2011. *Plaintiff's Exhibit 11*, *Loan Modification Agreement.*

58.    Matthews testified that he commenced making mortgage payments totaling the scheduled Chase Claim amount of $108,798.70 in Schedule D to Chase in 2011, which were not credited towards the mortgage. *Matthews Trial Testimony*, January 22, 2015 at 2:07-2:10 p.m.  Instead, Chase placed the payments in a suspense or impound account. *Id.*

## CONCLUSIONS OF LAW

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  The matters before the court are core proceedings under 28 U.S.C. § 157(b)(2)(I) and (J).  Venue is proper in this court pursuant to 28 U.S.C. § 1409(a).

**I. Rule 4004 and 4007 of the Federal Rules of Bankruptcy Procedure Defenses**

As a preliminary matter, in its Order Denying Motion to Amend Pre-Trial Stipulation and Pleadings, the court denied Matthews's motion to amend and/or supplement pleadings, including, among other things, his answer and the parties' Amended Joint Pre-Trial Stipulation and Order thereon, "*except that the [P]arties are granted leave to present evidence and argument at trial on the issues of [D]efendant's waiver of his 4004 and 4007 defenses, whether 4004 and 4007 defenses constitute substantive statues of limitations, and whether revivor of Westland [ ] cured any such timeliness defect*."  ECF 142 (emphasis added); *see also, Kontrick v. Ryan*, 540 U.S. 443, 459 (2004) (a defense based on Rule 4004 of the Federal Rules of Bankruptcy Procedure could be raised, at the latest, 'at the trial on the merits'").

Accordingly, in his proposed findings of fact and conclusions of law, Matthews argues that Westland lacked capacity to file the Complaint under California law because it was a suspended California corporation at the time that it filed its Complaint. *Defendant's [Proposed] Findings of Fact and Conclusions of Law*, ECF 168 at 44-47.

1  Matthews further argues that the court should dismiss Westland's Complaint as untimely

2  filed because the statute of limitations contained in Rules 4004 and 4007 of the Federal

3  Rules of Bankruptcy Procedure had run by the time Westland's corporate status was

4  reinstated.  *Id.*  The court disagrees with, and rejects, Matthews's argument for the

5  reasons stated herein.

6       Pursuant to Rule 7017 of the Federal Rules of Bankruptcy Procedure, which

7  incorporates by reference Rule 17(b)(2) of the Federal Rules of Civil Procedure, capacity

8  to sue or be sued is determined "for a corporation, by the law under which it was

9  organized".  Matthews cites to a California Court of Appeal decision in *Friends of Shingle*

10 *Springs Interchange, Inc. v. County of El Dorado,* 200 Cal.App.4th 1470 (2011) for the

11 proposition that a suit filed by a corporation while its powers are suspended does not toll

12 the statute of limitations in California, and if the statute runs out prior to revivor, the action

13 is time-barred.  200 Cal.App.4th at 1486-1487.  The California Court of Appeal in *Friends*

14 *of Shingle Springs Interchange, Inc. v. County of El Dorado* further noted that "the failure

15 timely to file the litigation within the statute of limitations has been held (in the context of

16 corporate suspension) to be a *substantive* defense that is not prejudiced by subsequent

17 corporate revivor."  *Id.* at 1494 (citation omitted) (emphasis in original).  The *Summary of*

18 *California Law* similarly notes that, in the context of corporate suspension, "[t]he statute of

19 limitations is a *substantive* defense, and a revivor after it has run will not save the barred

20 action."  9 Witkin, *Summary of California Law*, Corporations § 225(2) at 995-996 (10th ed.

21 2005 and 2016 Supp.) (citations omitted) (emphasis added).  Matthews contends, without

22 providing any legal authority in support thereof, that Rules 4004 and 4007 of the Federal

23 Rules of Bankruptcy Procedure are statutes of limitations and, therefore, substantive

24 defenses.

25      Based on the Ninth Circuit's decision in *In re Hill*, 811 F.2d 484 (9th Cir. 1987),

26 and the Bankruptcy Appellate Panel for the Ninth Circuit's decision in *In re Burns*, 102

27 B.R. 750, 752 (9th Cir. BAP 1989), Rules 4004 and 4007 of the Federal Rules of

28 Bankruptcy Procedure do not appear to be statutes of limitations and substantive in

nature.  In relevant part, under Rule 4004(a) of the Federal Rules of Bankruptcy

Procedure, an objection to the debtor's discharge must be filed "no later than 60 days

after the first date set for the meeting of creditors under § 341(a)."  Under Rule 4007(c) of

the Federal Rules of Bankruptcy Procedure, a complaint to determine dischargeability of

a debt under Section 523(c) of the Bankruptcy Code must also "be filed no later than 60

days after the first date set for the meeting of creditors under § 341(a)."  The court may

extend the deadlines on motion for cause shown under certain circumstances.  *See*

Rules 4004(b) and 4007(c) of the Federal Rules of Bankruptcy Procedure.  In *In re Hill*,

the Ninth Circuit explained that:

> Although rule 4007(c) in some respects resembles a statute of limitations,
> its effects are quite different.  Statutes of limitations effect primary conduct -
> - behavior apart from any litigation -- by providing repose to potential
> defendants.  Such statutes are not designed to manage ongoing litigation.
> In contrast, rule 4007(c) is triggered only by certain events within
> bankruptcy litigation.  The rule does not grant repose to the debtor or
> anyone else.  Instead, it avoids delay by requiring a party to file promptly
> rather than just prior to the final settlement of the bankruptcy case.  *See*
> Bankr. R. 9006 advisory committee's note (such rules serve the "interest of
> prompt administration of bankruptcy cases.  Therefore, it affects procedural
> not substantive rights.").

811 F.2d at 486-487.  The Bankruptcy Appellate Panel in *In re Burns*, citing to the Ninth

Circuit's decision in *In re Hill*, similarly determined that "Rules 4007(c) and 4004(a) [which

are virtually identical] are 'procedural' in nature."  102 B.R. at 752.  Thus, based on these

well-reasoned, if not controlling, authorities, the court concludes that Rules 4004 and

4007 of the Federal Rules of Bankruptcy Procedure are statutes of limitations and, as a

result, substantive defenses.

Under California law, "[p]rocedural acts in the prosecution or defense of a lawsuit

are validated retroactively by corporate revival."  *Benton v. County of Napa*, 226

Cal.App.3d 1485, 1490 (1991); *see also*, 9 Witkin, *Summary of California Law*,

Corporations § 225(2) at 995-996 (citations omitted) ("The retroactive effect of revivor on

maintenance or defense of an action extends only to procedural acts."), *citing, Benton v.*

*County of Napa,* 226 Cal.App.3d at 1490.  Accordingly, because the court determines

that Federal Rules of Bankruptcy Procedure 4004 and 4007 are procedural and not

1   substantive in nature consistent with the Ninth Circuit's decision in *Hill* and the BAP's

2   decision in *Burns*, the court further determines that the revival of Westland's corporate

3   status on December 6, 2013 during the pendency of the adversary proceeding and

4   before trial retroactively validated the filing of Westland's Complaint on March 28, 2012

5   and cured any timeliness issues.  Therefore, the court rejects Matthews's defense based

6   on the untimeliness of Westland's Complaint under Federal Rules of Bankruptcy

7   Procedure 4004 and 4007 and denies his request for dismissal of this adversary

8   proceeding on this ground.

9        **II. First Claim for Relief: 11 U.S.C. § 523(a)(2)(A)**

10        11 U.S.C. § 523(a) provides, in pertinent part, that an individual debtor is not

11   entitled to a Chapter 7 discharge from any debt—

12        (2) for money, property, services, or an extension, renewal, refinancing of
     credit, to the extent obtained by—

13
14        (A) false pretenses, a false representation, or actual fraud, other than a
     statement respecting the debtor's or an insider's financial condition . . . .

15
16        The elements of a claim under 11 U.S.C. §523(a)(2)(A) are: (1) the debtor made

17   representations; (2) that at the time the debtor knew they were false; (3) the debtor made

     those representations with the intention and purpose of deceiving the creditor; (4) the

18   creditor justifiably relied on these representations; and (5) the creditor sustained losses

19   as a proximate result of the debtor's representations.  *Ghomeshi v. Sabban (In re*

20   *Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010) (citations omitted); *Citibank (South*

21   *Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996) (citations

22   omitted); *accord, Van Zandt v. Mbunda (In re Mbunda)*, 484 B.R. 344, 350 (9th Cir. BAP

23   2012).  "[T]here is no requirement that the debtor 'have received a direct or indirect

24   benefit from his or her fraudulent activity in order to make out a violation of [Section]

25   523(a)(2)(A).'"  *In re Sabban,* 600 F.3d at 1222, *citing, Muegler v. Bening*, 413 F.3d 980,

26   983-984 (9th Cir. 2005).

27

28

1    The court further observes that the Supreme Court's recent decision in *Husky*

2 *International Electronics, Inc. v. Ritz, Jr.,* 136 S.Ct. 1581 (2016), draws a distinction

3 between "false representation" and "actual fraud" for the purposes of 11 U.S.C. §

4 523(a)(2)(A), explaining that "[t]he term 'actual fraud' in § 523(a)(2)(A) encompasses

5 forms of fraud, like fraudulent conveyance schemes, that can be effected without a false

6 representation." 136 S.Ct. at 1586. The Supreme Court further explained that:

7    "Actual fraud" has two parts: actual and fraud. The word "actual" has a
     simple meaning in the context of common-law fraud: It denotes any fraud
8    that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S.
     704, 709, 24 L. Ed. 586 (1878). "Actual" fraud stands in contrast to
9    "implied" fraud or fraud "in law," which describe acts of deception that "may
     exist without the imputation of bad faith or immorality." *Ibid.* Thus, anything
10   that counts as "fraud" and is done with wrongful intent is "actual fraud."

11 *Id.* at 1586-1587. The Supreme Court declined to give a specific definition of "fraud," but

12 noted that historically fraud has included fraudulent conveyance schemes that impair a

13 creditor's ability to collect the debt. *Id.* at 1587.

14    "The creditor bears the burden of proving the applicability of § 523(a)(2)(A) by a

15 preponderance of the evidence." *In re Sabban*, 600 F.3d at 1222, *citing Turtle Rock*

16 *Meadows Homeowners Association v. Slyman* (*In re Slyman*), 234 F.3d 1081, 1085

17 (9th Cir. 2000). "In order to avoid unjustifiably impairing a debtor's fresh start, [the Ninth

18 Circuit has] held that the exception 'should be construed strictly against creditors and in

19 favor of debtors.'" *In re Sabban*, 600 F.3d at 1222, *citing Klapp v. Landsman (In re*

20 *Klapp)*, 706 F.2d 998, 999 (9th Cir. 1983); *cf. Beaupied v. Chang (In re Chang)*, 163 F.3d

21 1138, 1140 (9th Cir. 1998).

22    In the present case, Westland argues that the damages awarded in the State

23 Court Judgment in the amount of $2,016,709.00 are nondischargeable under 11 U.S.C. §

24 523(a)(2)(A) based on a false misrepresentation theory. However, for the reasons

25 explained below, the court determines that Westland has not established by a

26 preponderance of the evidence that Matthews made any fraudulent misrepresentations to

27 Westland under 11 U.S.C. § 523(a)(2)(A).

28

**A.  Matthews is Not Collaterally Estopped from Re-litigating His Violation of California Rule of Professional Conduct 3-310(C)**

Westland contends that the State Court Judgment and State Bar Decision conclusively decided that Matthews violated California Rule of Professional Conduct 3-310(C) and, therefore, Matthews is collaterally estopped from re-litigating this issue before this court.  *Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 11-12.  Westland relies on the State Bar Judgment's and State Bar Decision's preclusive effect regarding this issue to argue that each element of 11 U.S.C. § 523(a)(2)(A) is satisfied.  Thus, the court must first determine whether it should give preclusive effect to the State Court Judgment and State Bar Decision.

Collateral estoppel bars the re-litigation of issues argued and decided in prior proceedings.  *Yaikian v. Yaikian* (*In re Yaikian*), 508 B.R. 175, 182 (Bankr. S.D. Cal. 2014), *citing Mycogen Corp. v. Monsanto Co.*, 28 Cal.4th 888, 894 (2002) (California law); *Taylor v. Sturgell*, 533 U.S. 880, 892 (2008) (federal law).  "In determining the collateral estoppel effect of a state court judgment, federal courts must, as a matter of full faith and credit, apply that state's law of collateral estoppel."  *Bugna v. McArthur (In re Bugna)*, 33 F.3d 1054, 1057 (9th Cir. 1994).  Accordingly, the collateral estoppel effect of the State Court Judgment and State Bar Decision regarding Matthews's violation of California Rule of Professional Conduct 3-310(C) is governed by California law.

In California, collateral estoppel applies when the following elements are satisfied:

> (1) the party against whom the plea is raised was a party or was in privity with a party to the prior adjudication, (2) there was a final judgment on the merits in the prior action and (3) the issue necessarily decided in the prior adjudication is identical to the one that is sought to be relitigated . . . In addition to these factors, and especially where collateral estoppel is applied 'offensively' to preclude a defendant from relitigating an issue the defendant previously litigated and lost, the courts consider whether the party against whom the earlier decision is asserted had a 'full and fair' opportunity to litigate the issue.

*Roos v. Red*, 130 Cal.App.4th 870, 879-880 (2005), *citing inter alia*, *Coscia v. McKenna Cuneo*, 25 Cal.4th 1194, 1201 (2001); *Parklane Hosiery Company, Inc. v. Shore,* 439 U.S. 322, 332-333 (1979); and *Kremer v. Chemical Construction Corporation*, 456 U.S.

461, 480-481 (1982).  The party asserting collateral estoppel bears the burden of

establishing the requirements.  *Lucido v. Superior Court*, 51 Cal. 3d 335, 341 (1990),

*citing, Vella v. Hudgins*, 20 Cal. 3d 251, 257 (1977).

### 1)  State Court Judgment

The State Court Judgment was entered against Matthews in the prior State Court

Action and was a final judgment on the merits.  Nevertheless, Westland has not

demonstrated that the Los Angeles Superior Court necessarily decided that Matthews's

violated California Rule of Professional Conduct 3-310(C).  The special jury verdict, on

which the State Court Judgment is based, only found that  Matthews represented

Westland from "January 25, 1999 to May 15, 1999," that he did not breach his legal

service agreement with Westland; that he owed Westland a fiduciary duty and that he

breached that fiduciary duty, damaging Westland in the amount of $2,016,709.00; and

Matthews's representation of Westland fell below the standard duty of care and,

therefore, he committed legal malpractice against Westland, damaging Westland in the

amount of $2,016,709.00.  *Defendant's Exhibit O*, *State Court Judgment.*  The special

jury verdict did not find that the breach of fiduciary duty or legal malpractice claims arose

from Matthews's violation of California Rule of Professional Conduct 3-310(C).  *See id.*

Additionally, the State Court Judgment itself did not make any determination regarding

Matthews's violation of California Rule of Professional Conduct 3-310(C).  Accordingly,

although Westland demonstrated the first and second elements of collateral estoppel, it

failed to demonstrate the third element of collateral estoppel and, therefore, the court

cannot give preclusive effect to the State Court Judgment regarding Matthews's alleged

violation of California Rule of Professional Conduct 3-310(C).

### 2)  State Bar Court Decision

The State Bar Court Decision issued against Matthews was based on the State

Bar Stipulation executed by and between Matthews and the State Bar of California, in

which Matthews expressly agreed and admitted that he violated California Rule of

Professional Conduct 3-310(C) by:

willfully making an inadequate written disclosure of the conflict of interest that arose once Westland's Board resolved to sell the [O]ption to Retra, a company in which [Matthews] held a financial interest, and by failing to obtain a supplemental written conflict of interest waiver from Westland when the transaction occurred.

*See Plaintiff's Exhibit 2, Stipulation re Facts, Conclusions of Law and Disposition and Order Approving Actual Suspension.*

In California, a prior judgment by consent or stipulation, as appears to be the case here, may be given preclusive effect if the parties manifest an intent on the face of the judgment to give it such preclusive effect. *Landeros v. Pankey*, 39 Cal.App.4th 1167, 1171–1174 (1995) (citations omitted). Because Matthews expressly agreed and admitted in the State Bar Stipulation that he violated California Rule of Professional Conduct 3-310(C) by making an inadequate written disclosure of the conflict of interest that arose once Westland's Board of Directors resolved to sell the Option to Retra, and by failing to obtain a supplemental written conflict of interest waiver from Westland when the transaction occurred, and agreeing to be bound by the terms of the State Bar Stipulation, the court determines that Matthews intended for the State Bar Stipulation to preclude further litigation of this particular issue.

Accordingly, the court determines that Westland has demonstrated that the first and third elements of collateral estoppel have been established. The issue arises, however, as to whether the State Bar Court Decision is a final judgment on the merits as required by the second collateral estoppel element.

The California Supreme Court in *In re Rose,* 22 Cal.4th 430 (2000), explained that "[t]he State Bar Court exercises no judicial power, but rather makes recommendations to this court, which then undertakes an independent determination of the law and the facts, exercises its inherent jurisdiction over attorney discipline, and enters the first and only disciplinary order." 22 Cal.4th at 436. The State Bar Court Decision itself notes that, "The effective date of this disposition is the effective date of the Supreme Court order herein, normally 30 days after file date. (*See* California Rules of Court 9.18(a))." *Plaintiff's Exhibit 2, Stipulation re Facts, Conclusions of Law and Disposition and Order*

*Approving Actual Suspension*.  California Rule of Court 9.18(a) provides in pertinent part

that, "Unless otherwise ordered, all orders of the Supreme Court imposing discipline or

opinions deciding causes involving the State Bar become final 30 days after filing."  Since

Westland did not provide a copy of the California Supreme Court's disciplinary order

regarding Matthews's disciplinary proceeding, Westland did not prove that the State Bar

Court Decision is final as required by the second collateral estoppel element.  Therefore,

the court cannot give preclusive effect to the State Bar Court Decision regarding

Matthews's violation of California Rule of Professional Conduct 3-310(C).

Even if the court were to give preclusive effect to the State Bar Court Decision

regarding Matthews's violation of California Rule of Professional Conduct 3-310(C), as

explained below, Matthews's violation of California Rule of Professional Conduct 3-310(C)

does not demonstrate that Matthews made a false misrepresentation to Westland under

11 U.S.C. § 523(a)(2)(A).

### B.  Westland Did Not Establish by a Preponderance of the Evidence that Matthews Made a False Representation under 11 U.S.C. § 523(a)(2)(A)

Westland contends that Matthews's violation of California Rule of Professional

Conduct 3-310(C) amounts to a false representation under 11 U.S.C. § 523(a)(2)(A).

*Plaintiff's [Proposed] Findings of Fact and Conclusion of Law*, ECF 166 and 167, at 10-

14.  Specifically, Westland argues that, under California Rule of Professional Conduct 3-

310(C), Matthews's "inadequate disclosure of the actual conflict of interest that arose in

his purchase of the [O]ption from Westland and failure to obtain a written [conflict of

interest] waiver, where he was under a duty to do so, constitutes a false representation

under §523(a)(2)(A)."  *Id.* at 13-14.  Westland relies on the Bankruptcy Appellate Panel's

decision in *Tallant v. Kaufman* (*In re Tallant*), 218 B.R. 58 (9th Cir. BAP 1998), in support

of its argument.  *Id.* at 14.

In *Tallant*, an attorney and his client were friends for two or so decades.  218 B.R.

at 61-63.  Over the years, the attorney represented his client's construction company, the

client himself, and the client's brother and father.  *Id.*  In relevant part, years down the

line, the attorney asked the client to borrow money and prepared a profit and loss

statement for his law practice at the request of the client without disclosing the attorney's

personal debt of $3 million. *Id.* The attorney also did not advise his client that their

pecuniary interests were adverse as a result of the loan transaction and the client had a

right to seek independent legal counsel under California Rule of Professional Conduct 3-

300. *Id.* The attorney then filed for bankruptcy, and the client filed a complaint for

nondischargeability of debt under, *inter alia*, 11 U.S.C. § 523(a)(2)(A). *Id.* The

bankruptcy court in *Tallant* held that the debt was nondischargeable under 11 U.S.C. §

523(a)(2)(A). *Id.*

The attorney appealed the bankruptcy court's decision to the Bankruptcy Appellate

Panel. *Id.* at 61. The Bankruptcy Appellate Panel in *Tallant* analyzed whether the

attorney's nondisclosure of information constituted a false representation for purposes of

11 U.S.C. § 523(a)(2)(A). 218 B.R. at 64-65. The Bankruptcy Appellate Panel, taking

note from the Supreme Court in *Field v. Mans*, 516 U.S. 59, 68-70 (1995), and the Ninth

Circuit in *In re Eashai*, 87 F.3d 1082, 1089 (9th Cir. 1996), relied on the common law

understanding of "actual fraud" when 11 U.S.C. § 523(a)(2)(A) was added to the

Bankruptcy Code turning to the Restatement (Second) of Torts, § 551 (1976) for the

applicable standard. *Id.* The Bankruptcy Appellate Panel focused specifically on the rule

for fraudulent nondisclosure, which provides that:

> One who fails to disclose to another a fact that he knows may justifiably
> induce the other to act or refrain from acting in a business transaction is
> subject to the same liability to the other as though he had represented the
> nonexistence of the matter that he has failed to disclose, if, but only if, he is
> under a duty to the other to exercise reasonable care to disclose the matter
> in question.

*Id.*, *citing* Restatement (Second) Torts, § 551(1) (1976). The Bankruptcy Appellate Panel

also noted that California Rule of Professional Conduct 3-300 codified this duty of

disclosure. *Id.*

The Bankruptcy Appellate Panel in *Tallant* noted the Tenth Circuit's decision in

*Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367 (10th Cir. 1996). *Id.* In *In re*

1    *Young*, an attorney had entered into business transactions with his client based on an

2    unwritten financial arrangement that lasted over a decade where they would offset their

3    respective bills for services.  *Id.*, *citing, In re Young*, 91 F.3d at 1373-1376.

4    Subsequently, the attorney executed a promissory note in favor of the client in the

5    amount the attorney owed the client for certain services.  *Id.*  The attorney never advised

6    his client to seek advice from another attorney about any of their transactions, the

7    conflicts of interest that existed between them, or that the client should speak to another

8    attorney about these conflicts.  *Id.*  The attorney defaulted under the note and filed for

9    bankruptcy.  *Id.*  The Tenth Circuit held that the attorney's breach of his ethical duty to

10   disclose the terms of the business transaction with the client in writing and potential

11   conflicts of interest under the New Mexico professional responsibility rule constituted a

12   false representation under 11 U.S.C. § 523(a)(2)(A).  *Id.*

13   Adopting the reasoning in *In re Young*, the Bankruptcy Appellate Panel in *Tallant*

14   held that "an attorney's failure to disclose information that he has a duty to disclose under

15   the professional responsibility rule *may* constitute a false representation under §

16   523(a)(2)(A)."  *Id.* (emphasis added).  Based on the facts presented in *Tallant*, the

17   Bankruptcy Appellate Panel, citing to the Restatement (Second) of Torts, § 551(1)

18   (1976), determined that the attorney's breach of his ethical duty was that he borrowed

19   money from his client without advising his client of the adverse nature of their relationship

20   by reason of the borrowing and the client's right to seek independent legal advice,

21   holding that "[b]y failing to advise Appellee [the client] of his right, the Appellant [the

22   attorney] misrepresented the legal protections afforded Appellee."  *Id.* at 65-66.

23   In the case at bar, Westland relies on the State Bar Court Decision to prove that

24   Matthews violated California Rule of Professional Conduct 3-310(C).  *Plaintiff's*

25   *[Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 10-14.

26   However, for the reasons stated above, the court cannot give preclusive effect to the

27   State Bar Court Decision regarding Matthews's violation of California Rule of Professional

28

1  Conduct 3-310(C).  Accordingly, Westland must demonstrate in fact here that Matthews

2  violated California Rule of Professional Conduct 3-310(C).

3       California Rule of Professional Conduct 3-310(C) provides in relevant part that,

4       A member shall not, without the informed written consent of each client:

5       (1) Accept representation of more than one client in a matter in which the
        interests of the clients potentially conflict; or

6

7       (2) Accept or continue representation of more than one client in a matter in
        which the interests of the clients actually conflict.

8  "A conflict of interest is actual between jointly represented clients whenever their common

9  lawyer's representation of one may be rendered less effective by reason of the

10  representation of the other."  *In re Jaeger*, 213 B.R. 578, 584 (Bankr. C.D. Cal. 1997)

11  (citation omitted).  "A conflict of interest is potential if there is no present actual conflict of

12  interest, but there is a possibility of an actual conflict arising in the future, resulting from

13  developments that have not yet occurred or facts that have not yet become known."  *Id.*

14  "[A]n attorney must obtain a second informed written consent if the potential conflict of

15  interest ripens into an actual conflict."  *Id.* at 585.

16       Westland contends that Matthews's "inadequate disclosure of the actual conflict of

17  interest that arose in his purchase of the [O]ption from Westland and failure to obtain a

18  written [conflict of interest] waiver, where he was under a duty to do so," constitutes a

19  violation of California Rule of Professional Conduct 3-310(C).  *Plaintiff's [Proposed]*

20  *Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 10-14.  Based on the

21  evidence submitted, the court determines, consistent with the State Bar Court Decision,

22  that Matthews violated California Rule of Professional Conduct 3-310(C) by failing to

23  obtain informed written consent from Westland of the actual conflict of interest that arose

24  when Westland resolved to sell the Option to Retra, a corporation in which Matthews had

25  a financial interest, and by failing to obtain the required supplemental written conflict of

26  interest waiver from Westland when the transaction occurred, even though Westland was

27  represented by Loder in the transaction.

28

35

However, the court does not determine that Matthews's violation of California Rule of Professional Conduct 3-310(C) here amounts to a false representation under 11 U.S.C. § 523(a)(2)(A).  Under the Restatement (Second) of Torts, § 551(1) (1976), Westland was required to demonstrate that Matthews did not disclose a material fact that he knew may justifiably induce Westland to act differently regarding or refrain from pursuing the sale of the Option to Retra.  Because Westland did not present any evidence at trial showing that it would have acted differently in the sale transaction with Retra had it been informed in writing of the actual conflict of interest that arose from Matthews's representation of Retra in the sale transaction or signed the required supplemental conflict of interest waiver, the court determines that Westland has not demonstrated by a preponderance of the evidence that Matthews failed to disclose a material fact that would have induced it to act differently in the sale transaction with Retra.

Additionally, unlike in *Young* and *Tallant*, where the attorneys never advised their clients to seek the advice of independent legal counsel regarding the business transactions, Westland was represented by Loder, not Matthews, in the sale transaction with Retra. *Valentine Trial Testimony*, January 22, 2015, at 11:20 a.m. (testifying that Loder represented Westland in the sale of the Option from Westland to Retra).  In fact, Westland knew that Matthews was representing Retra in the sale transaction as evidenced by Westland's Resolution to sell the Option to Retra. *Defendant's Exhibit F*, *Westland's Resolution* ("[Retra], by and through its representative, [Matthews] will hold Westland and its Board of Directors free and harmless from any and all liability for claims against Westland which have been identified in the April 21, 1999 [L]etter from Lorraine L. Loder to [Matthews]."); *see also*, *Valentine Trial Testimony*, January 22, 2015, at 11:21-11:26 a.m. (admitting that he knew Matthews was representing another party's interest in the sale transaction other than Westland's).  Moreover, at the time Westland resolved to sell the Option to Retra, Westland was aware that Matthews had some pecuniary interest in the sale of the Option to Retra, because Matthews guaranteed

Retra's obligations under the sale transaction in Westland's Resolution. *Id.* The court further notes that Valentine, who was a member of the Westland's Board of Directors, testified that he always believed Matthews was the purchaser of the Option. *Valentine Trial Testimony*, January 22, 2015, at 11:21-11:26 a.m.

Based on the foregoing facts, because Westland's interests in the sale transaction with Retra were represented by Loder and not Matthews, Westland knew that Matthews had some interest in the sale of the Option to Retra at the time it resolved to sell the Option to Retra; and Westland failed to produce any evidence that it would have sold the Option to an entity other than Retra had it received informed written consent of the actual conflict of interest that arose from Matthews's representation of Retra in the sale transaction or signed the supplemental written conflict of interest waiver, this court does not find that Matthews's violation of California Rule of Professional Conduct 3-310(C) amounts to a false representation under 11 U.S.C. § 523(a)(2)(A). Accordingly, the court finds that Westland has not demonstrated by a preponderance of the evidence that Matthews made a false representation to Westland under 11 U.S.C. § 523(a)(2)(A).

### C. Westland Did Not Establish by a Preponderance of the Evidence that Matthews Knowingly Made a False Representations under 11 U.S.C. § 523(a)(2)(A)

The second 11 U.S.C. § 523(a)(2)(A) element requires the creditor to demonstrate by a preponderance of the evidence that the debtor made a false representation that at the time he knew was false. *In re Sabban*, 600 F.3d at 1222 (citation omitted). The BAP in *Tallant* equated knowledge of an attorney's duty to disclose with knowledge of falsity for purposes of the second element of 11 U.S.C. § 523(a)(2)(A), holding that because the attorney in that case "had knowledge of his duty to disclose," he therefore had "knowledge of the falsity at the time of the loan transaction." *In re Tallant*, 218 B.R. at 66. Here, Westland did not establish by a preponderance of the evidence that Matthews's violation of California Rule of Professional Conduct 3-310(C) constituted a false representation for purposes of 11 U.S.C. § 523(a)(2)(A). Consequently, the court

1    determines that Westland has not shown by a preponderance of the evidence that

2    Matthews knowingly made a false representation under 11 U.S.C. § 523(a)(2)(A).

3        **D.  Westland Did Not Establish By A Preponderance of the Evidence that Matthews Intended to Deceive Westland in the Sale of the Option from Westland to Retra**

4

5        The third 11 U.S.C. § 523(a)(2)(A) element requires the creditor to demonstrate by

6    a preponderance of the evidence that the debtor made the false representation with the

7    intention and purpose of deceiving the creditor.  *In re Sabban*, 600 F.3d at 1222 (citation

8    omitted).  "Intent to defraud is a question of fact.  Since fraudulent intent rarely can be

9    proven directly, it may be inferred from surrounding circumstances."  4 March, Ahart and

10   Shapiro, *California Practice Guide: Bankruptcy*, ¶ 22:467 at 22-69 (2015), *citing, In re*

11   *Kennedy*, 108 F.3d 1015, 1018 (9th Cir.1997); *see also*, *In re Tallant*, 218 B.R. at 66

12   (intent may be inferred from the totality of the circumstances) (citations omitted).

13       It appears that Westland again argues that the court should give preclusive effect

14   to the State Court Judgment and State Bar Court Decision regarding Matthews's violation

15   of California Rule of Professional Conduct 3-310(C), arguing that his violation of this

16   ethical rule establishes that Matthews intended to deceive Westland in the sale of the

17   Option from Westland to Retra.  *Plaintiff's [Proposed] Findings of Fact and Conclusions*

18   *of Law*, ECF 166 and 167, at 14.  As explained above, the court declines to give

19   preclusive effect to the State Court Judgment and State Bar Court Decision on this issue;

20   however, the court does determine that Matthews violated California Rule of Professional

21   Conduct 3-310(C) by failing to obtain informed written consent from Westland of the

22   actual conflict of interest that arose when Westland resolved to sell the Option to

23   Retra, a corporation in which Matthews had a financial interest, and by failing to

24   obtain the required supplemental written conflict of interest waiver from Westland

25   when the transaction occurred.

26       The court reiterates its findings that Matthews's violation of California Rule of

27   Professional Conduct 3-310(C) does not constitute a false representation under 11

28

38

U.S.C. § 523(a)(2)(A) for the reasons stated above, nor does it show an intent by Matthews to deceive Westland in the sale transaction with Retra.  Based on the evidence submitted, Westland, which was represented by Loder in the sale transaction, knew that Matthews was representing Retra in the sale transaction and guaranteeing Retra's obligations under the sale transaction.  *Valentine Trial Testimony*, January 22, 2015 at 11:20 a.m. (testifying that Loder represented Westland in the sale transaction with Retra); *see also*, *Defendant's Exhibit F*, *Westland's Resolution*.  Valentine, a member of Westland's Board of Directors, even admitted that he always believed Matthews was the purchaser of the Option.  *Valentine Trial Testimony*, January 22, 2015 at 11:21-11:26 a.m. (testifying that he knew Matthews was representing another party's interest in the sale transaction between Westland and Retra and that he always believed Matthews was the purchaser of the Option).  Furthermore, Westland did not submit any evidence to indicate that Matthews influenced the purchase price of the Option, which was set by Westland and which Retra agreed to pay in consideration for the Option.  *See Defendant's Exhibit F*, *Westland's Resolution*.

Because Westland was represented by Loder and not Matthews in the sale of the Option from Westland to Retra, and Westland knew that Matthews had some interest in the sale of the Option since he was guaranteeing Retra's obligations thereunder, the court is not convinced that Matthews intended to deceive Westland in the transaction. Additionally, the court determines that Matthews's violation of California Rule of Professional Conduct 3-310(C) does not, by itself, demonstrate an intent to deceive Westland in the sale transaction in light of Westland's knowledge of Matthews's involvement in the transaction.  Accordingly, the court determines that Westland has not demonstrated by a preponderance of the evidence that the third 11 U.S.C. § 523(a)(2)(A) element is satisfied.

*///*

**E.  Westland Did Not Establish by a Preponderance of the Evidence that Westland Justifiably Relied on Matthews's Fraudulent Misrepresentation and that such Misrepresentation Caused Westland Damage in the Amount of $2,016,709.00**

The fourth and fifth 11 U.S.C. § 523(a)(2)(A) elements require the creditor to demonstrate by a preponderance of the evidence that the creditor justifiably relied on the debtor's false representation and that the creditor was damaged as the proximate result of the misrepresentation having been made.  *In re Sabban*, 600 F.3d at 1222 (citation omitted); *Field v. Mans*, 516 U.S. at 73-76 (reliance need not reach level of "reasonableness" to establish nondischargeability under 11 U.S.C. § 523(a)(2)(A), but must still be justifiable).   In a non-disclosure context, the nondisclosure of a material fact in the face of a duty to disclose has been held to establish the requisite reliance and causation for actual fraud under 11 U.S.C. § 523(a)(2)(A).  *In re Apte*, 96 F.3d 1319, 1323 (9th Cir. 1996) (citations omitted).  As in *Tallant*, the Ninth Circuit in *Apte*, taking direction from the Supreme Court in *Field v. Mans*, looked to the Restatement (Second) of Torts, § 551 (1976), in determining whether there was a duty to disclose.  *Id.* at 1323-1324.

Westland argues that "[t]he issues of reliance and causation of damages due to [D]efendant['s] violation of [California Rule of Professional Conduct,] Rule 3-310 is conclusively established by the [S]tate [C]ourt [J]udgment as those questions were necessary to the [J]udgment and was specifically found by the [S]tate court jury on the breach of fiduciary duty cause of action, which was predicated on the violation of [California] Rule of Professional Conduct[,] Rule 3-310."  *Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 15-16.  As explained above, the court declines to give preclusive effect to the State Court Judgment as well as the State Bar Court Decision regarding Matthews's violation of California Rule of Professional Conduct 3-310(C); notwithstanding, however, the court determines that Matthews violated California Rule of Professional Conduct 3-310(C).

As also explained above, even though the court determines that Matthews violated California Rule of Professional Conduct 3-310(C), the court finds that his failure to obtain informed written consent from Westland of the actual conflict of interest that arose when Westland resolved to sell the Option to Retra and the supplemental written conflict of interest waiver did not influence Westland's decision to sell the Option to Retra because Westland was represented by Loder and not Matthews in the sale transaction, Westland knew that Matthews was representing Retra in that transaction, Westland knew that Matthews had some interest in the sale transaction because he guaranteed Retra's obligations thereunder, Valentine testified that he always believed that Matthews was acquiring the Option, and Westland did not present any evidence at trial that it would have sold the Option to another entity even if Matthews had complied with California Rule of Professional Conduct 3-310(C).

Because Westland, apparently relying on the State Court Judgment, did not offer evidence of its alleged damages in the amount of $2,016,709.00 as a proximate result of Matthews's violation of California Rule of Professional Conduct 3-310(C), the court does not determine whether its suffered such damages as a result of such ethical violation under 11 U.S.C. § 523(a)(2)(A).

Accordingly, the court determines that Westland has not demonstrated by a preponderance of the evidence that the elements of justifiable reliance and proximate causation have been established under 11 U.S.C. § 523(a)(2)(A).

Therefore, based on the foregoing, the court determines that Westland has not shown by a preponderance of the evidence that the State Court Judgment in the amount of $2,016,709.00 should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A) and, as a result, the court determines that Westland's first claim for relief under 11 U.S.C. § 523(a)(2)(A) should be denied.

### III. Third, Fourth and Sixth Claims for Relief:  Objection to Discharge

Westland's third, fourth and sixth claims for relief seek denial of Matthews's Chapter 7 discharge pursuant to 11 U.S.C. §§ 727(a)(2), (3) and (5), respectively.  "The

party seeking revocation bears the burden of establishing the requisite elements by a

preponderance of the evidence."  4 March, Ahart and Shapiro, *California Practice Guide:*

*Bankruptcy*, ¶ 22:1808 at 22-218 (2015), *citing, In re Covino*, 241 B.R. 673, 677 (Bankr.

D. Idaho 1999), *citing Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Western Wire Works,*

*Inc.* v. *Lawler* (*In re Lawler*), 141 B.R. 425, 429 (9th Cir. BAP 1992) (determining that the

preponderance standard should apply in both dischargeability cases under 11 U.S.C. §

523 and discharge cases under 11 U.S.C. § 727); *see also*, Rule 4005 of the Federal

Rules of Bankruptcy Procedure ("At trial on a complaint objecting to a discharge, the

plaintiff has the burden of proving the objection.").

### A.  Third Claim for Relief:  11 U.S.C. § 727(a)(2)

11 U.S.C. § 727(a) provides, in pertinent part, that the court shall grant the debtor

a discharge, unless:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer
> of the estate charged with custody of property under this title, has
> transferred, removed, destroyed, mutilated, or concealed, or has permitted
> to be transferred, removed destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing of
> the petition; or
>
> (B) property of the estate, after the date of the filing of the petition.

"Two elements comprise an objection to discharge under § 727(a)(2)(A): 1) a

disposition of property, such as transfer or concealment, and 2) a subjective intent on the

debtor's part to hinder, delay or defraud a creditor through the act disposing of the

property."  *Hughes v. Lawson* (*In re Lawson*), 122 F.3d 1237, 1240 (9th Cir. 1997).

"[F]raudulent intent may be established by circumstantial evidence, or by inferences

drawn from a course of conduct."  *Devers et al v. Bank of Sheridan, Montana* (*In re*

*Devers*), 759 F.2d 751, 753-54 (9th Cir. 1985), *citing Farmers Co-op Association v.*

*Strunk,* 671 F.2d 391, 395 (10th Cir.1982).   "The statute is to be construed liberally in

favor of debtors and strictly against the objector."  *In re Devers*, 759 F.2d at 753-754,

*citing, In re Adlman,* 541 F.2d 999, 1003 (2d Cir. 1976); *In re Rubin,* 12 B.R. 436, 440

(Bankr. S.D.N.Y.1981).

Westland argues that Matthews concealed estate property in his Schedules and Statement of Financial Affairs by failing to adequately account for Leodis C. Matthews, APC's value, income and expenses. *Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 18-23. Additionally, although not addressed in its proposed findings of fact and conclusions of law, Westland argued in its closing argument to the court that Matthews concealed part of his non-debtor spouse's income on his Schedule I and concealed $108,798.70 in cash on his Schedule B stemming from certain mortgage payments Matthews allegedly made to his lender. *Trial Transcript*, January 23, 2015 at 2:29-2:44 p.m.

The court first observes that Westland is only objecting to Matthews's Chapter 7 discharge under 11 U.S.C. § 727(a)(2) on a concealment theory. It does not appear that Westland is alleging there was any transfer, removal, destruction, or mutilation of property of the debtor or estate, which are the other categories of acts that could lead to the denial of a debtor's discharge under 11 U.S.C. § 727(a)(2).

On his Schedule B, attached to the Petition, Matthews valued his interest in Leodis C. Matthews, APC on the Petition Date at $0.00. *Plaintiff's Exhibit 1*, *Schedule B.* Westland questions the accuracy of Matthews's valuation of Leodis C. Matthews, APC on his Schedule B, noting that the Leodis C. Matthews, APC: Statement of Profit and Loss Through September 30, 2011 showed "net income" of $155,130.35. *Plaintiff's Exhibit 1*, ECF 1, *Schedule B and Leodis C. Matthews, APC: Statement of Profit and Loss through September 30, 2011*. Nonetheless, as argued by Matthews, a corporation's "net income" does not reflect an owner's equity interest in that corporation or the value of that corporation. Additionally, Matthews testified that after September 30, 2011, Leodis C. Matthews, APC's business dropped off as a result of his pending California State Bar charges, and at the beginning of January 2012, he became an employee of DaCheng, *Defendant's Trial Testimony*, January 22, 2015, at 2:21-2:22 p.m.; *Defendant's Trial Testimony*, January 23, 2015, at 9:44-9:45 a.m., explaining the loss in value of his interest in Leodis C. Matthews, APC as well as any diminution in value of Leodis C.

1   Matthews, APC.  Westland did not submit any evidence to contradict Matthews's

2   explanation or that would lead this court to determine that Matthews failed to adequately

3   value his equity interest in Leodis C. Matthews, APC or the value of Leodis C. Matthews,

4   APC in his schedules and statement of financial affairs.

5        It appears Westland also argues that Matthews failed to account for the

6   $155,130.35 net income reflected in the Leodis C. Matthews, APC:  Statement of Profit

7   and Loss through September 30, 2011 in his schedules and statement of financial affairs.

8   *Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 23.

9   However, Matthews testified that he did not know what happened to the $155,130.35

10  because the Leodis C. Matthews, APC: Statement of Profit and Loss through September

11  30, 2011 was on an accrual basis to be adjusted and reconciled when its tax return was

12  filed,  *Matthews Trial Testimony,* January 22, 2015, at 1:52-1:56 p.m.; *id.*, January 23,

13  2015, at 9:16 a.m., and that there was no $155,130.35 in cash available from Leodis C.

14  Matthews, APC at the end of September 30, 2011, *Matthews Trial Testimony*, January

15  22, 2015, at 1:52-1:56 p.m.  Westland did not submit any evidence demonstrating that

16  the $155,130.35 was actually available at the end of September 30, 2011 or mishandled

17  by Matthews.

18       Westland further argues that the Leodis C. Matthews, APC:  Statement of Profit

19  and Loss through September 30, 2011, filed with the petition, and the updated Leodis C.

20  Matthews, APC: Statement of Profit and Loss from January through December 2011,

21  dated August 8, 2012, are inconsistent.  However, as explained by Matthews, the

22  inconsistencies arise because both statements were on an accrual basis, which were to

23  be adjusted and reconciled at the end of the year when Leodis C. Matthews, APC filed its

24  tax return. *Matthews Trial Testimony,* January 22, 2015 at 1:53-1:55 p.m..; *id.*, January

25  23, 2015 at 9:16 a.m.  Westland also appears to argue that Matthews should have filed

26  the updated Leodis C. Matthews, APC: Statement of Profit and Loss from January

27  through December 2011, dated August 8, 2012, with the court and made available to all

28  creditors.  The court agrees that Matthews should have filed an amended profit and loss

44

statement for his law practice with the court; however, the court determines that Westland

has not demonstrated that Matthews concealed the updated profit and loss statement

from creditors, especially because Matthews made the statement available to the

Chapter 7 Trustee at his Federal Rule of Bankruptcy Procedure 2004 examination on

August 9, 2012 according to Westland and Westland itself had a copy.

Westland also notes that Leodis C. Matthews, APC reported on its 2011 tax return

$507,164.00 in total income; $437,890.00 in total deductions; and $69,274.00 in taxable

income. *Plaintiff's Proposed Findings of Fact and Conclusion of Law*, ECF 166 and 167,

at 8; *Plaintiff's Exhibit 5*, *Leodis C. Matthews, APC's 2011 Tax Return*.  Westland argues

that Leodis C. Matthews, APC did not disclose Matthews's $240,000.00 draw reflected in

its Leodis C. Matthews, APC: Statement of Profit and Loss through September 30, 2011

and the $85,299.61 in costs of goods sold reflected in its Leodis C. Matthews, APC:

Statement of Profit and Loss from January through December 2011 in its 2011 tax return.

*Plaintiff's [Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 8;

*Plaintiff's Exhibit 5*, *Leodis C. Matthews, APC's 2011 Tax Return*.  Westland further

contends that the operating expenses reflected in the Leodis C. Matthews, APC:

Statement of Profit and Loss from January through December 2011, including the

claimed expenses for rent, repairs and maintenance, utilities, legal fees, and "ask my

accountant" are inconsistent with those reported in Leodis C. Matthews, APC's 2011 tax

return. *Plaintiff's Proposed Findings of Fact and Conclusions of Law*, ECF 166 and 167,

at 20-21; *see also*, *Plaintiff's Exhibit 5*, *Leodis C. Matthews, APC's 2011 Tax Return*.

However, Matthews's testimony that the profit and loss statements were on an accrual

basis to be adjusted and reconciled when Leodis C. Matthews, APC filed its tax return

indicates that such inconsistencies might exist between the statements and tax return.

*See Matthews Trial Testimony,* January 22, 2015, at 1:53-1:55 p.m.; *id.*, January 23,

2015, at 9:16 a.m.  Westland did not question Matthews regarding any inconsistencies in

Leodis C. Matthews, APC's 2011 tax return or present any evidence demonstrating those

1    inconsistencies.  The court is not convinced that Matthews concealed any assets based

2    on the alleged inconsistencies in the statements and 2011 tax return.

3              Furthermore, Westland argued at trial that Matthews did not disclose all of

4    Alexander's income on his Schedule I, including her monthly income generated from

5    Leodis C. Matthews, APC, pointing to a number of checks that were issued by Leodis C.

6    Matthews, APC to Alexander in 2011.  *Trial Transcript*, January 23, 2011 at 2:35-2:44

7    p.m.; *see also*, *Plaintiff's Exhibit 3*, *Leodis C. Matthews, APC:  Statement of Profit and*

8    *Loss for January through December 2011* at 43-45.  "The debtor's income as calculated

9    on Schedule I is an *estimate of average projected income* at the time the case is filed and

10   differs from the debtor's 'current monthly income' calculation on a Chapter 7 debtor's

11   statement of current monthly income . . . ."  1 March, Ahart and Shapiro, *California*

12   *Practice Guide: Bankruptcy*, ¶ 5:799 at 5(I)-146 (emphasis in original).  Thus, the debtor's

13   income as calculated on Schedule I is a snapshot of the debtor's income at the time the

14   petition was filed.  Matthews testified that Alexander "occasionally" worked at Leodis C.

15   Matthews, APC in 2011, *Matthews Trial Testimony*, January 22, 2015 at 2:43-2:44 p.m.,

16   and the court notes that a majority of the checks were issued to Alexander in the first half

17   of 2011 and Alexander made a nominal sum in the latter half of that year, *Plaintiff's*

18   *Exhibit 3*, *Leodis C. Matthews, APC:  Statement of Profit and Loss for January through*

19   *December 2011* at 43-45.  Additionally, Westland did not submit any evidence

20   demonstrating that Alexander continued to generate any income from Leodis C.

21   Matthews, APC in the beginning of January 2012 after Matthews left Leodis C. Matthews,

22   APC.  Therefore, the court finds that Matthews did not improperly conceal part of

23   Alexander's monthly income on his Schedule I at the time Matthews filed his Chapter 7

24   bankruptcy petition.

25             Lastly, on his Schedule D, Matthews listed a secured claim in the amount of

26   $108,798.70 in favor of Chase for certain mortgage payments Matthews made to Chase

27   in 2011 on his Rossmore Property.  *Plaintiff's Exhibit 1*, ECF 1, *Schedules A and D*.

28   Matthews characterized the Chase Claim as "disputed impound balance residence" on

1  his Schedule D.  *Id.*  Matthews testified at trial that he commenced making the mortgage

2  payments to Chase in 2011, but Chase did not credit the payments towards the

3  mortgage.  *Matthews Trial Testimony*, January 22, 2015, at 2:07-2:10 p.m.  Instead,

4  Chase placed the payments in an impound account.  *Id.*  Westland argues that Matthews

5  concealed the $108,798.70 in cash as an asset of the estate because the $108,798.70

6  was not credited to the mortgage payments by Chase and instead was placed in the

7  impound account.  *Trial Transcript*, January 23, 2015 at 2:29-2:32 p.m.  The court

8  disagrees with Westland's reasoning and determines that Matthews properly scheduled

9  the Chase Claim because, at the time the Petition was filed, Matthews had just entered

10  into a loan modification agreement with Chase that took effect on December 1, 2011 and

11  Matthews paid the $108,798.70 to Chase for the purpose of paying down the mortgage.

12  *Plaintiff's Exhibit 11*, *Loan Modification Agreement.*

13        Therefore, based on the above analysis, the court determines that Westland has

14  not demonstrated by a preponderance of the evidence that Matthews concealed any of

15  his property or estate property actionable under 11 U.S.C. § 727(a)(2).  Accordingly,

16  Westland's third claim for relief should be denied.

17        **B.  Fourth Claim for Relief:  11 U.S.C. § 727(a)(3)**

18        Under 11 U.S.C. § 727(a)(3), the court shall grant the debtor a discharge, unless

19  "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve

20  any recorded information, including books, documents, records, and papers, from which

21  the debtor's financial condition or business transactions might be ascertained, unless

22  such act or failure to act was justified under all the circumstances of the case."  "'In order

23  to state a prima facie case under Section 727(a)(3), a creditor objecting to discharge

24  must show (1) that the debtor failed to maintain and preserve adequate records, and (2)

25  that such failure makes it impossible to ascertain the debtor's financial condition and

26  material business transaction.'"  *Lansdowne v. Cox* (*In re Cox*)*, 41 F.3d 1294, 1296,

27  *citing, Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992).  "Once the objecting

28  party shows that the debtor's records are absent or are inadequate, the burden of proof

1    then shifts to the debtor to justify the inadequacy or nonexistence of the records." *Id.*,

2    *citing inter alia*, *Meridian Bank v. Alten*, 958 F.2d at 1233.

3        Westland argues that Matthews failed to maintain and preserve adequate records

4    regarding Leodis C. Matthews, APC, therefore, making it impossible for Matthews's

5    creditors to ascertain his financial condition and material business transactions. *Plaintiff's*

6    *[Proposed] Findings of Fact and Conclusions of Law*, ECF 166 and 167, at 18-23.

7    Westland reiterates its arguments made in support of its 11 U.S.C. § 727(a)(2) claim for

8    relief regarding Matthews's alleged failure to adequately account for Leodis C. Matthews,

9    APC's value, income and expenses.  However, as explained above, Matthews provided

10    satisfactory explanation regarding the decrease in value of Leodis C. Matthews, APC, the

11    whereabouts of the $155,130.35 reflected in the Leodis C. Matthews, APC: Statement of

12    Profit and Loss Through September 30, 2011, and the inconsistencies in the profit and

13    loss statements and the 2011 tax return.

14        Thus, the court determines that Westland has not demonstrated by a

15    preponderance of the evidence that Matthews should be denied a Chapter 7 bankruptcy

16    discharge under 11 U.S.C. § 727(a)(3).  Accordingly, Westland's fourth claim for relief

17    should be denied.

18            **C.  Sixth Claim for Relief:  11 U.S.C. § 727(a)(5)**

19        11 U.S.C. § 727(a)(5) provides that the court shall grant the debtor a discharge,

20    unless "the debtor has failed to explain satisfactorily, before determination of denial of

21    discharge under this paragraph, any loss of assets or deficiency of assets to meet the

22    debtor's liabilities."  Under 11 U.S.C. § 727(a)(5), the creditor objecting to discharge must

23    show (1) the debtor at one time, not too remote from the bankruptcy petition date, owned

24    identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief

25    granted, the debtor no longer owned the assets or the assets were deficient to meet the

26    debtor's liabilities; and (3) the bankruptcy pleadings or statement of affairs do not reflect

27    an adequate explanation for the disposition or deficiency of the assets.  *Samson v. Retz*

28    *(In re Retz),* 606 F.3d 1189, 1205 (9th Cir. 2010) (citations omitted).  "Once the creditor

1   has made a prima facie case, the debtor must offer credible evidence regarding the

2   [deficiency of or] disposition of the missing assets." *See In re Retz,* 606 F.3d at 1205,

3   *citing, In re Devers*, 759 F.2d at 754.

4         Westland argues that Matthews failed to provide an adequate explanation of the

5   diminution in value of Leodis C. Matthews, APC, from $155,130.33 as reflected in the

6   Leodis C. Matthews, APC: Statement of Profit and Loss through September 30, 2011 to

7   $0 as reflected in Matthews's Schedule B. *Plaintiff's [Proposed] Findings of Fact and*

8   *Conclusions of Law*, ECF 166 and 167, at 22-23.

9         The court notes that, on his Schedule B, attached to the petition, Matthews valued

10   his interest in Leodis C. Matthews, APC on the Petition Date at $0.00. *Plaintiff's Exhibit*

11   *1, Schedule B.* The $155,130.35 reflected in the Leodis C. Matthews, APC:  Statement

12   of Profit and Loss through September 30, 2011 constituted "net income" and not

13   Matthews's equity interest in Leodis C. Matthews, APC nor the value of Leodis C.

14   Matthews, APC as of September 30, 2011. *Id.*, *Leodis C. Matthews, APC: Statement of*

15   *Profit and Loss through September 30, 2011*. Furthermore, Matthews satisfactorily

16   explained his $0 interest in Leodis C. Matthews, APC, as well as the diminution in value

17   of Leodis C. Matthews, APC, at the time the Petition was filed, testifying that after

18   September 30, 2011, Leodis C. Matthews, APC's business dropped off as a result of his

19   pending California State Bar charges, and at the beginning of January 2012, he became

20   an employee of DaCheng, *Matthews Trial Testimony*, January 22, 2015 at 2:21-2:22

21   p.m.; *id.*, January 23, 2015 at 9:44-9:45 a.m.; *see also*, *Defendant's Exhibit AA*, *Letter*

22   *from Ling Xiao, Managing Partner of DaCheng, to Matthews Regarding Matthews's Legal*

23   *Position with DaCheng*.

24         Because Westland did not submit sufficient credible evidence that demonstrates

25   Leodis C. Matthews, APC, was actually valued at $155,130.35 on September 30, 2011 or

26   establishing the value of Leodis C. Matthews, APC, and because Westland did not

27   demonstrate that Matthews improperly valued his interest in Leodis C. Matthews, APC,

28   as well as the value of Leodis C. Matthews, APC, at the time the petition was filed, the

court determines that Westland has not proven its claim under 11 U.S.C. § 727(a)(5) by a preponderance of the evidence.  Accordingly, the court determines that Matthews's sixth claim for relief should be denied.

For the foregoing reasons, the court determines that Westland has not met its burden of proving by a preponderance of the evidence that it is entitled to relief on its claims under 11 U.S.C. §§ 523(a)(2)(A) and 727(a)(2), (a)(3) and (a)(5).  The court orders counsel for Matthews to submit a proposed judgment consistent with this memorandum decision and order within 30 days of the date of entry of this memorandum decision and order.

**IT IS SO ORDERED.**

# # #

Date: October 3, 2016

_____

Robert Kwan
United States Bankruptcy Judge